Daniel J. Mogin (SBN 95624)
Jodie M. Williams (SBN 247848)
Jennifer M. Oliver (SBN 311196)
**MOGINRUBIN LLP**
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone:  (619) 687-6611
Facsimile:  (619) 687-6610
dmogin@moginrubin.com
jwilliams@moginrubin.com
joliver@moginrubin.com

Jonathan L. Rubin (*Pro hac vice*)
**MOGINRUBIN LLP**
1615 M Street, NW, Third Floor
Washington, D.C. 20036
T: 202-630-0616
F: 877-247-8586
jrubin@moginrubin.com

*Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Payment Logistics Limited, <br><br> Plaintiff, <br><br> v. <br><br> Lighthouse Network, LLC, Shift4 Corporation and Shift4 Payments, LLC, <br><br> Defendants. | Case No. 18-cv-00786-L-AGS <br><br> **FIRST AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL ANTITRUST LAWS 15 U.S.C. § 18, 15 U.S.C. § 2** <br><br><br> **JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

GLOSSARY ............................................................................................. ii

NATURE OF THE ACTION ....................................................................1

JURISDICTION AND VENUE ...............................................................12

PARTIES .................................................................................................13

PAYMENT PROCESSING INDUSTRY ...............................................14

   Point-of-Sale Systems..........................................................................15

      A. POS Hardware ....................................................................... 15

      B. POS Software ......................................................................... 15

      C. MLTSR POS Dealers ............................................................. 16

      D. POS Systems for MLTSR ...................................................... 17

   Payment Interfaces...............................................................................21

   Merchant Account Services .................................................................24

RELEVANT PRODUCT MARKETS ....................................................25

   Payment Interfaces for Defendant-Owned POS Systems for MLTSR ..............25

   Payment Interfaces for POS Systems Specializing in MLTSR.........................26

LIGHTHOUSE'S ACQUISITIONS ARE ANTICOMPETITIVE.......................27

NEW ENTRY IS UNLIKELY ...............................................................37

FIRST CLAIM FOR RELIEF ................................................................38

   Clayton Act, Section 7, 15 U.S.C. §18 ................................................38

SECOND CLAIM FOR RELIEF............................................................39

   Attempted Monopolization in Violation of the Sherman Act, Section 2 15 U.S.C. §2 39

THIRD CLAIM FOR RELIEF................................................................41

   Monopolization in Violation of the Sherman Act, Section 2 15 U.S.C. §2 .......41

FOURTH CLAIM FOR RELIEF............................................................42

   Tying in Violation of the Sherman Act, Section 1 15 U.S.C. §1 .......................42

PRAYER FOR RELIEF .........................................................................42

JURY DEMAND.....................................................................................45

i

# GLOSSARY

**PLL:**  Payment Logistics Limited, Plaintiff in this action; a full-service payment integration technology company focusing on providing payment processing interfaces ("Payment Interfaces") and merchant account services ("MAS") to mid-to-large table-service restaurants ("MLTSR").

> **Paygistix Payment Gateway.**  Payment Interface developed by PLL for Point-of-Sale Systems ("POS Systems") specializing in MLTSR.

**Shift4 Payments:**  Shift4 Payments, LLC, Defendant in this action; the entity resulting from Lighthouse's acquisition of Shift4 Corporation ("Shift4 Corp.").

> **Shift4 Corp.:**  Shift4 Corporation, Defendant in this action; pre-merger, offered a "neutral" independent Payment Interface; Shift4 Corp. was acquired by Lighthouse Network, LLC ("Lighthouse") in January 2018.

> **Lighthouse:**  Lighthouse Network, LLC, Defendant in this action; a financial services organization offering integrated payment processing and point-of-sale products that acquired Shift4 Corp., Action Systems Inc. ("ASI"), Future POS, Inc. and Restaurant Data Concepts, Inc.

> > **Harbortouch:**  POS System for MLTSR developed by Lighthouse.

> > **ASI:**  Action Systems, Inc.; an Independent Software Vendor ("ISV") that developed Restaurant Manager and was acquired by Lighthouse in August 2017.

> > **Restaurant Manager:**  A POS System for MLTSR developed by ASI and acquired by Lighthouse in August 2017.

> > **Future POS, Inc.:**  ISV which developed a POS System called Future POS and was acquired by Lighthouse in Fall 2017.

> > **Future POS:**  POS System for MLTSR developed by Future POS, Inc. and acquired by Lighthouse in Fall 2017.

> > **Restaurant Data Concepts, Inc.:**  ISV which developed the POSitouch POS System and was acquired by Lighthouse in Fall 2017.

> > **POSitouch:** POS System for MLTSR developed by Restaurant Data Concepts, Inc. and acquired by Lighthouse in Fall 2017.

GLOSSARY

**Defendant-owned POS Systems**: POS Systems owned by Lighthouse prior to the Shift4 Corp. acquisition, including Harbortouch, Restaurant Manager, Future POS and POSitouch.

**EMV (Europay, Mastercard, and Visa):** The global standard for security and acceptance of chip-based debit and credit cards.

**Gateway:** Network that provides access to other networks and enables transmitted data to use its routing paths; Payment Gateway is synonymous with Payment Interface.

**Payment Interface or Interface:** Type of Interface that transmits electronic payment card data from the POS System to the MAS (and back again) while providing increased data security and related services.

**Closed Payment Interface:** Type of Payment Interface dedicated to a MAS provider (and, sometimes, POS System) and charges additional fees or "tolls" to use a MAS provider outside of the network.

**Neutral Payment Interface:** Type of Payment Interface capable of integrating with multiple MAS providers and that charges the same fee for data transmission or makes its Payment Interface available for use under similar terms irrespective of the MAS provider.

**Application Programming Interface ("API"):** Type of interface that simplifies the computer programming process and can act as a bridge between an application and the computer's operating system.

**ISV:** Independent Software Vendor; a POS System developer that creates a POS System.

**Kiosk (or Terminal):** Hardware that resides in the restaurant and contains the POS System Software programs, including the Payment Interface.

**Merchant Account Services ("MAS"):** A service that enables merchants to accept credit and debit card payments by managing electronic payment card information and funds exchanges between merchant banks, payment processing networks, and card issuing banks.

**Mid-to-Large Table-Service Restaurants ("MLTSR"):** Segment of food and beverage establishments that typically have 10 or fewer locations nationwide, two or more POS System terminals, and generate $50,000 or more in average monthly electronic payment volume per location. The Lighthouse POS System brands specialize in MLTSR.

**GLOSSARY**

**Enterprise restaurants:** Food and beverage establishments with more than ten locations throughout the United States.

**Quick-serve counter-service restaurants:** Restaurants with limited menu offerings where order placement is at the counter with few to no wait staff.

**Middleware:** A type of software interface installed on a local network that connects local applications or systems with external applications or systems.

**Payment Processor:** A MAS provider appointed by a merchant to enable credit and debit card acceptance and funding.

**POS or POS System:** Point-of-Sale System; a technological solution comprised of hardware, software and support services that is instrumental in managing MLTSR operations.

**POS Hardware:** Kiosks or terminals and sometimes handheld devices that reside in the restaurant and contain POS System Software programs.

**POS Software:** Programs within the POS System that enable order placement, table management, employee time tracking and management, management reporting on staff productivity, financial operations management, menu item performance, inventory tracking, and payment processing, among other things.

**POS Services:** External technology personnel that ensure that the POS System functions properly. These services generally include the installation and configuration of POS System, merchant training, and ongoing merchant support.

**POS Dealer (or VAR or Reseller):** Sells POS and Interfaces to merchants and acts as the intermediary between the merchant and ISV. The POS Dealer is often the sole point-of-contact with the merchant and is responsible for presenting all POS and integrated Interface options to the merchant.

**Tokenization:** Process through which a Payment Interface substitutes sensitive cardholder and authentication data with non-sensitive reference data, called a token, and which can be stored by the merchant and used to perform later transactions.

iv

**GLOSSARY**

Plaintiff Payment Logistics Limited, based on knowledge as to itself and its own acts and on information and belief as to all other matters, and, demanding trial by jury, brings this civil action under Section 7 of the Clayton Act, 15 U.S.C. §18, Section 2 of the Sherman Act, 15 U.S.C. §2, and Section 1 of the Sherman Act, 15 U.S.C. §1, to preliminarily and permanently enjoin Lighthouse Network, LLC's acquisition of Shift4 Corporation, and prevent the combined company from monopolizing, attempting to monopolize and unlawfully tying products in the relevant markets.

## NATURE OF THE ACTION

1. This case involves conduct well known in antitrust jurisprudence. An upstream party, such as a manufacturer, needs add-on suppliers/resellers to reach end-users, develop a new market, establish a presence in that market, customize the product to meet customer needs or offer aftermarket services. It engages add-on suppliers and value-add resellers to such a degree that their products or services are viewed as unified by the end-users. These downstream suppliers and resellers compete against one another resulting in lower prices and enhanced services. Then, once the customer base is locked-in and essentially unable to switch to a competing product/service, the upstream party tries to monopolize the market by cutting out the downstream parties, claiming it is just offering efficiencies while positioning itself to unilaterally raise prices and exert market power against a locked-in customer base. Downstream competition withers, customers are left with no alternatives but to pay the manufacturer's higher prices, and innovation suffers. *Eastman Kodak v. Image Technical Services*, 504 U.S. 451 (1992) and *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) are illustrative real-world examples. Like the hypothetical upstream party or real-world examples Eastman Kodak and Microsoft, Defendants here are exerting market power to cut out the downstream parties and exploit a locked-in customer base to raise prices and monopolize the market.

2. This case concerns payment processing and POS Systems for MLTSR

1

**FIRST AMENDED COMPLAINT**

restaurants.  POS Systems include computer hardware, software and services that, among many other functions, enable users to process electronic payments such as credit and debit cards.  MAS manage electronic payment information and fund exchanges between merchants and banks, payment processing networks and card issuing banks.  Payment Interfaces, comprised of gateways, middleware and a combination of the two, connect POS Systems to MAS.  They provide the essential functions of encrypting and transmitting sensitive payment data, reducing the threat of data fraud and theft, and allowing merchants to manage electronic payments.

3.     Payment Interface providers establish strategic partnerships with upstream developers or ISVs, downstream value-added POS Dealers, and end-users like restaurant-merchants.  Relationships with POS Dealers are critical because they are the primary point of contact with the merchant and responsible for presenting Interface choice.  While some Payment Interfaces are "neutral" allowing end-users to choose and change MAS providers ("Payment Processors") and banks at will with little or no cost or effort, other Payment Interfaces are "closed."

4.     Plaintiff Payment Logistics Limited ("PLL") is a family-owned, San Diego, California-based full-service payment integration technology company for ISVs, POS Dealers, and merchants, including MLTSR.  PLL's core business is providing Payment Interfaces such as its Paygistix Payment Gateway and MAS to MLTSR through integration with POS Systems such as Restaurant Manager.  Figures 1-5 below show the products and services PLL provides to POS Systems and payment card devices, and how Payment Interfaces transmit merchant information for payment processing:

2

**FIRST AMENDED COMPLAINT**

**Figure 1:**
**Restaurant Manager POS System Screen[1]**



---

[1]    https://www.google.com/search?q=restaurant+manager+POS+System&client= firefox-b-1-ab&source=lnms&tbm=isch&sa=X&ved=0ahUKEwi6lcPe24_ aAhUL2WMKHfJmCb4Q_AUICigB&biw=1500&bih=836#imgrc=52xlTL20TPB yZM (last viewed Nov. 8, 2018).

3

**FIRST AMENDED COMPLAINT**

**Figure 2:**
**Payment Card Devices[2]**



---

[2] PLL marketing materials.

**FIRST AMENDED COMPLAINT**

**Figure 3:**
**Merchant Account Services User Screen[3]**



[3] PLL marketing materials.

5
**FIRST AMENDED COMPLAINT**

**Figure 4:**
**Merchant Data Transmission Through Payment Interface[4]**



---

[4] PLL marketing materials.

6

**FIRST AMENDED COMPLAINT**

**Figure 5:**
**Complete Payment Processing Network[5]**



POS System          Payment Interface          MAS

5.    Before 2017, Defendant Lighthouse provided POS and MAS services to the MLTSR segment, described in Defendants' contemporaneous business records as ███████████████████████████.  In 2017, in rapid order, Lighthouse acquired multiple ISVs and POS for MLTSR, including Action Systems, Inc. and its Restaurant Manager POS, Future POS, Inc. and its Future POS and Restaurant Data Concepts, Inc and its POSitouch POS System.

6.    Defendant Shift4 Corp. was an independent Interface provider that sold

---

[5]https://www.google.com/imgres?imgurl=https%3A%2F%2Fpaxfaqs.files. wordpress.com%2F2014%2F04%2Fintegration-digram.png&imgrefurl =https%3A%2F%2Fpaxfaqs.wordpress.com%2Fintegrated-terminals%2F &docid=84SDj-ovVULOZM&tbnid=dgOzZvbx9fzHaM%3A&vet= 10ahUKEwjJ66HY2o_aAhVH82MKHfHZAj0QMwh6KAgwCA..i&w=1666&h=9 33&client=firefox-b-1-ab&bih=836&biw=1500&q=gateway% 20terminal%20for%20point%20of%20sale%20system&ved=0ahUKEwjJ66HY2o _aAhVH82MKHfHZAj0QMwh6KAgwCA&iact=mrc&uact=8 (last viewed Nov. 8, 2018).

**FIRST AMENDED COMPLAINT**

a product called Payment Interfaces. In January 2018, Lighthouse acquired Shift4 Corp. and transformed itself into Shift4 Payments. Pre-merger, Shift4 Corp. did not have a significant presence in the MLTSR market.  Its Interface was MAS "neutral," meaning restaurants could choose and change MAS providers without incurring monetary penalties.  As part of the merger, however, Lighthouse planned to ██████

████████████████████████████████████████████████████████

████████████████████████████████████

7.    Lighthouse is an avaricious acquirer that intends to control the MLTSR payment processing ██████ Defendants' █████████████ explains that, ████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████ It took control of Shift4 Corp. in January 2018 and began reducing the presence of independent Payment Interfaces on the Restaurant Manager POS System.  Within the next eight months, the combined Shift4 Payments negotiated at least two more strategic partnerships with MLTSR ISVs – Posera (Maitre'D) and Micros.

**FIRST AMENDED COMPLAINT**

**Figure 6:**





8. Former Lighthouse and current Shift4 Payments CEO Jared Isaacman called the Shift4 Corp. acquisition ███████████████ The company's ███████████████ asserts ███████████████████████████████████████████████████████████████████████████████ Post-merger, Defendants intend █████████████████ CEO Isaacman stated Defendants' intent to ███████████████████████████████████████████████████████████████████████████████ All this will be accomplished by ███████████████████████████████████████████████████████████████████████████. According to Issacman, the transformed Shift4 Payments will ███████████████████████████████████████████████████████ By Defendants' own accounts, the intent of the merger is to ███████████████████████████████████████

9. Recent changes to EMV compliance have made Payment Interfaces

9

**FIRST AMENDED COMPLAINT**

essential to MLTSR POS; direct connections are cost prohibitive and not suitable alternatives. To that end, Defendants' predecessor ASI enlisted PLL in April 2015. Before the subject mergers, PLL competed with other Payment Interface and MAS providers for Restaurant Manager accounts, providing state-of-the-art services at competitive prices. PLL spent the next one and one-half years customizing and modifying its Payment Interface to address the complex needs of the Restaurant Manager POS System for integration and creating innovative add-ins to differentiate Restaurant Manager and increase data security. The relationship was a success for all parties involved, particularly restaurant-merchants. ASI aggressively marketed the benefits of the enhanced functionalities provided by its integrated Payment Interfaces. This fostered competition among Payment Interfaces, kept prices low and service quality high. Consumers benefited from innovative data security products that reduced the threat of their personal information being stolen.

10. The Shift4 Corp. transaction was the tipping point and changed the competitive dynamic described above. Defendants' ███████████ projects that, ███████████



Lighthouse's ███████████

CEO Isaacman recognizes that ███████████

He directed his employees to ███████████

By the Shift4 acquisition, Defendants are removing ███████████, or market disruptor, which the Department of Justice and Federal Trade Commission recognize

10

**FIRST AMENDED COMPLAINT**

to be anticompetitive.  According to the parties, the deal did not reach regulatory thresholds to trigger federal antitrust agency review.

11.   As planned, post-merger, Defendants have implemented "tolls" for merchants processing outside its network, forcing them to terminate their relationships with competing Interfaces.  They are requiring new software licenses to be automatically set up to process payments through Shift4 Payments.  They are threatening POS Dealers to either fall in line or risk losing business to someone who will.   POS Dealers have no choice but to steer merchants to terminate their relationships with competing Interfaces and switch to Defendants.   Some are representing that competing Interfaces are no longer options.  Some are switching merchants without the merchants' knowledge.  They are denying Payment Interface competitors access to the minimum viable scale necessary for viable competitors to remain in the market.  Defendants are abandoning Shift4 Corp.'s prior commitment to neutrality and using ████████████ to lock them into a closed system that allows Shift4 Payments to raise prices to supracompetitive levels.  Shift4 Payments is now the single gatekeeper controlling access to a critical mass of locked-in customers, both current and prospective.  In addition to moving restaurant-merchants to the Shift4 Payments locked-in network, Defendants are attempting to commoditize the enhanced Payment Interface features created by PLL and others, smothering innovation efforts including those intended to further increase data security and restaurant operations.

12.   These anticompetitive actions are unbeknown or undisclosed to restaurant-merchants.  Defendants are requiring that merchants process payments through the Shift4 Interface, but are not disclosing that information on their POS contracts and are continuing to promote the Interface as payment processor-neutral.[6]

---

[6] *See* Partner With Us Save Time. Save Money. Partner With Shift4 for EMV., Shift4 Payments, LLC, https://www.shift4.com/m/insight/emv/ (last viewed Nov. 8, 2018); Shift4 Payments FAQs, Shift4 Payments, LLC, https://www.shift4.com/m/client/faq/#tippytop (last viewed Nov. 8, 2018).

**FIRST AMENDED COMPLAINT**

Existing customers, who purchased the POS before the Shift4 Corp. transaction, could not have anticipated that (1) Defendants would be acquiring an Interface; and (2) they would be forced over to Defendants' products.  Because of this asymmetric information, merchants could not have negotiated away their lock-in, or ██████████ ██████████████████, when purchasing Defendants' POS.

13.   Ultimately, merchants and their customers will pay the cost of the lost competition in the form of higher prices and reduced innovation and services.  Pre-merger, merchants could protect themselves from Payment Interface or MAS price increases by switching to competing products compatible with the Defendant-owned POS Systems.  Defendants' documents confirm their intent to eliminate merchants' ability to insulate from a price increase by removing competing Interfaces and exploiting their lock-in.  Without competition at the Interface level, Defendants will be able to unilaterally raise prices for its Payment Interface services and for its MAS. Compounding the harm, removing independent Payment Interfaces will deny competitors the minimum viable scale to continue operating and they will be forced to exit altogether.  Removing companies such as PLL from the market will eliminate the competitive pressure to continue to develop cutting-edge applications.  MLTSR merchants will be forced to pay supracompetitive Payment Interface and MAS prices, consumers' sensitive personal information will be put at greater risk, and merchants will not realize the innovation of a competitive Payment Interface market. Defendants' mergers are likely to substantially lessen competition in the relevant product markets and competition is being foreclosed and monopolized.

## JURISDICTION AND VENUE

14.   This action is brought under Section 15 of the Clayton Act, 15 U.S.C. §26, seeking to enjoin Defendants from violating Section 7 of the Clayton Act, 15 U.S.C. §18, Section 2 of the Sherman Act, 15 U.S.C. §2, and Section 1 of the Sherman Act, 15 U.S.C. §1, and under Section 4 of the Clayton Act, 15 U.S.C. §15.

15.   This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and

12

**FIRST AMENDED COMPLAINT**

1337 because this case is being brought to enforce the federal antitrust laws, presents a substantial federal question, and is protecting "trade and commerce against restraints and monopolies."

16.    Defendants Shift4 Corp. and Lighthouse sell their products and services in interstate commerce, transact business in this district and can be found in this district, rendering them subject to the personal jurisdiction of this Court.  Venue is therefore proper in this district under Section 12 of the Clayton Act, 15 U.S.C. §22, and 28 U.S.C. §1391.

## PARTIES

17.    Plaintiff PLL is a family-owned Nevada limited liability company with its principal place of business in San Diego, California.  PLL is an integrated payment processing solutions provider, offering Payment Interface and MAS services and other products, including to clients operating Defendant-owned POS Systems.

18.    Defendant Lighthouse, formed in 2017, is a Pennsylvania limited liability company with its principal place of business in Allentown, Pennsylvania.  Lighthouse describes itself as a leading financial organization, powering the top POS brands in the hospitality and retail sectors and offering integrated payment processing and point-of-sale solutions.  Its POS System brands include Harbortouch, Restaurant Manager, Future POS and POSitouch, which its CEO calls the ███████ ████████  Lighthouse sells POS Systems throughout the United States, including in San Diego, California.

19.    Defendant Shift4 Corp. is a Nevada corporation founded in 1994 with its principal place of business in Las Vegas, Nevada.  Prior to its acquisition by Lighthouse, Shift4 Corp. offered Dollars on the Net, which it marketed as the world's largest independent or neutral payment gateway and which was and is sold throughout the United States, including in San Diego, California.

20.    Shift4 Payments is a limited liability company with its principal place of business in Las Vegas, Nevada.  On or about January 15, 2018, Lighthouse

13

**FIRST AMENDED COMPLAINT**

announced that it had acquired Shift4 Corp., and was rebranding as Defendant Shift4 Payments. Defendant Shift4 Payments is to replace the Lighthouse Network brand at the top of the organization and is powering the company's POS System-Payment Interface-MAS networks. It holds itself out as the leader in secure payment processing solutions in the restaurant industry, among others. The newly formed company is anticipated to process over 1 billion transactions annually for nearly 200,000 businesses, representing over $100 billion in payments each year throughout the United States, including in San Diego, California.

21. The acts alleged to have been done by Defendants were authorized, ordered, or performed by their directors, officers, managers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

22. Each of the Defendants named herein acted as the agent or joint-venturer of or for the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

## PAYMENT PROCESSING INDUSTRY

23. Paying for a meal at a restaurant by an electronic payment card is now commonplace. A customer offers a payment card at the conclusion of a meal. A server accepts the card, swipes or inserts it into a hardware device, and offers a receipt.

24. Processing the payment takes only seconds to complete, but in that time a series of digital communications take place. As Figures 4 and 5 above depict, when the customer's credit or debit card is accepted at the restaurant, encrypted information is transmitted to the payment processor affiliated with the merchant, then to the bank affiliated with the credit card for authorization, then the restaurant-merchant is notified that the customer has sufficient funds or credit and the transaction is approved. Payment is then provided to the restaurant-merchant through the credit card interchange process.

25. Three components are necessary to ensure that the transaction is

14

**FIRST AMENDED COMPLAINT**

processed securely and efficiently: the POS System, the Payment Interface, and the MAS. The Interface is a necessary piece due to recent EMV compliance regulations.

### Point-of-Sale Systems

26. The POS System includes hardware, software and support services that help manage restaurant operations. Together with the Payment Interface and the MAS, POS Systems allow restaurant-merchants to enter payment card transactions and communicate with third-party processing companies such as PLL and Shift4 Payments. POS Systems also enable management functions such as order placement, table management, management reporting on items such as staff productivity, menu item performance and a wide variety of other important operations information, inventory control and back office reporting.

### A.   POS Hardware

27. POS System hardware components include kiosks or terminals, much like computers, that allow servers to enter a customer's food order, communicate orders with the kitchen, manage deliveries, record entry and exit times, and track inventory, among many other things. Restaurants may also have handheld terminals that allow servers to enter orders and, sometimes, process payments at the table. The hardware components must be durable to withstand heavy use by multiple employees and the unforgiving physical restaurant environment. (*See* Glossary, Figure 2 above.)

### B.   POS Software

28. The software component provides computing capabilities for the restaurant and functionality for the hardware. For instance, the software tallies a customer's order, adds tax and other charges, and prints the total amount for the customer to remit payment. The software is also the first step in the payment processing system, where electronic payment information is entered to facilitate the exchange among Payment Processors and banks described above. POS System Software often must be integrated with a Payment Interface to transmit payment information to the MAS for processing. (*See* Figure 1, above.)

15

**FIRST AMENDED COMPLAINT**

## C. MLTSR POS Dealers

29. POS Dealers are the primary point-of-contact with MLTSR merchants. They initiate the merchant relationship, sell the POS hardware and software for the initial install, and provide system and software upgrades and technological support. POS Dealers essentially become merchants' out-sourced IT personnel and trusted business partner. Many merchants rely exclusively on their POS Dealers for recommendations on software upgrades and payment processing solutions. Relevant here, Dealers present merchants with Interface options. Interface providers rely on Dealers for access to customers. In addition to revenues from merchants, POS Dealers also earn revenue through profit-sharing and other incentive programs with ISVs, Interface providers, and MAS.

30. POS systems and their Interfaces and MAS are priced in a complex manner with multiple considerations such as initial hardware costs, ongoing license fees, repair costs, training costs, business disruption costs, costs of scaling a system post-install, and payment processing costs. Payment processing costs are complex, defined by the different features of a transaction such as the type of payment card used and how card information is entered for transmission (e.g., typed in by the merchant, typed in by the patron, or read via magnetic stripe or EMV chip). EMV compliance adds another layer of complexity. Merchants rely on POS Dealers to communicate the costs and provide the best POS solution. They do not have the time and resources to understand these complexities to negotiate more favorable terms (e.g., prevent Interface and MAS lock-in).[7]

31. POS Dealers typically do not discuss Interface and MAS options when the POS purchase is made. Merchants' concern at that stage is the software functionality for restaurant operations like order placement, table management, management inventory systems, and other mission critical functions unrelated to

---

[7] *See, e.g.*, Dkt. Nos. 25-5, 25-6, 53-29.

**FIRST AMENDED COMPLAINT**

payment processing.   For instance, when San Diego, California-based Sadaf Restaurant No. 2, Inc. ("Sadaf") installed Restaurant Manager, it considered whether the POS had the functionality to process payments and provide data security.  It did not discuss Interface and MAS options.  The Interface is not addressed until after the initial POS purchase is made.  At that point, POS Dealers can only offer the integrated Interfaces.

### D. POS Systems for MLTSR

32.   One feature specific to MLTSR is the POS System's ability to serve as the restaurant's brain.  Their POS Systems must have the ability to place orders and display in a kitchen, manage table seating and reservations, combine orders placed with bartenders and waitstaff into a single bill, add mandatory gratuity, track and control inventory, manage deliveries, record employee entry and exit times, measure employee productivity, assist with financial management, and sometimes, track customer loyalty programs.  These software programs must be customized to each restaurant-merchants' needs.  Systems serving quick-serve, counter-service restaurants do not have the level of customization necessary for a MLTSR.  Similarly, newer systems built around the cloud do not have the level of customization or durable hardware devices required to serve MLTSR and therefore are not alternatives.

33.   The hardware, software and need for customization make the POS System an expensive and carefully calculated investment, costing $10,000 - $35,000 or more, per location for hardware and software costs alone.  In addition, MLTSR spend significant time training their personnel and ensuring that the POS System properly executes patrons' orders.  Training and installation costs can run upwards of $10,000, which does not include the additional costs of patrons lost due to negative dining experiences during the learning and integration period.  Under ordinary circumstances MLTSR rarely switch systems for at least five to seven years.  Rather, merchants are likely to upgrade the software, including the Payment Interface or

17

**FIRST AMENDED COMPLAINT**

MAS.

34.   ISVs develop POS Systems that specialize in specific segments of the restaurant industry.  According to Defendants' ███████████████████████████, Defendants' four wholly-owned ███████████████████ Harbortouch, Restaurant Manager, FuturePos and POSitouch, cater to the ████████████████████████ ███████[8] or restaurants with 10 or fewer locations nationwide, two or more POS System terminals, and generate $50,000 or more in electronic payment volume per month per location.  This presentation explains that the ██████████████████ ████████████████████████████████ ██████████████ ██████████████████████████████████████████

35.   Defendants' ████████████████ also distinguishes the ██████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████ ██ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████ Likewise, Defendants' deal documents explain that ████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ █████████████████████[13] They ███████████████████████████ ████████████████████████████████████████████████████ ████████ Defendants  confirm  that  ████████████████████████████

_____

[8] ██████████████████, Shift4_00032 at 52, 89.
[9] *Id*. at 89.
[10] *Id*. at 55.
[11] *Id*. at 84.
[12] *Id*. at 52.
[13] *Id*. at 52, 85.
[14] *Id*. at 85.

18

**FIRST AMENDED COMPLAINT**

███████████████████████████████████████████████████.[15]  For instance, ASI marketed Restaurant Manager to MLTSR, whereas Square, Inc.'s POS System specializes in quick-serve, counter-service restaurants.  MLTSR require systems that differ greatly from those used by quick-serve, counter-service restaurants or large, enterprise restaurants, therefore the POS Systems serving each class of restaurants are not interchangeable.

36.  Likewise, POS with direct connections to MAS are not options or substitutes for Interfaces.  Those connections use older, magnetic stripe technology to transmit payment.[16]  Recently, the major credit card companies developed EMV chips that increase security and prevent against data breaches and theft.[17]  Beginning in October 2015, merchants became liable for fraudulent transactions or data theft.[18]  MLTSR had to become EMV compliant to avoid liability.[19]  But, EMV compliance is costly and time consuming, especially for the MLTSR market.[20]  As Shift4 Payments promotional materials explain, "U.S. migration to EMV is typically a significant uphill climb" and "requires a major development effort and modification to basic system architecture, new programming of payment terminals, and a certification for each payment terminal/processor pair."[21]  They explain that using

[15] *Id*. at 52.

[16] *See, e.g.,* Magnetic Strip Technology: A Dying Technology in the US, Universal SmartCards Inc. (July 31, 2017), https://www.usmartcards.com/2017/07/31/magnetic-strip-technology-a-dying-technology-in-the-us/ (last viewed Nov. 8, 2018).

[17] Large Scale Payment Data Breaches Highlight Need for U.S. Card Issuers and Retailers to Move More Quickly to Smart Chip Payment Technology, EMV Connection (Jan. 2014), http://www.emv-connection.com/smart-chip-payment-card-brief/ (last viewed Nov. 8, 2018).

[18]*Id.*

[19] *See* Understanding the U.S. EMV Liability Shifts, U.S. Payments Forum (July 2017), http://www.uspaymentsforum.org/wp-content/uploads/2017/07/EMV-Fraud-Liability-Shift-WP-FINAL-July-2017.pdf (last viewed Nov. 8, 2018).

[20] *See* Where EMV Certification Is A Big Headache, Digital Transactions (Sept. 1, 2015), http://www.digitaltransactions.net/magazine_articles/where-emv-certification-is-a-big-headache/ (last viewed Nov. 8, 2018).

[21] One Last Payment Integration, Shift4 Corporation, https://www.shift4.com/pdf/S4-One-Last-Payment-Integration.pdf (last viewed Nov. 8, 2018).

**FIRST AMENDED COMPLAINT**

the Shift4 Interface allows merchants to "get EMV access to every U.S. processor when you interface to us.  This is far less expensive and uses a fraction of the time it would take to interface to a single processor or create a number of direct EMV interfaces."[22]  PLL competitor DataCap's CEO explained that "[t]he certification process is long, deep, and ugly."[23]  Heartland Payments Systems ("Heartland"), which owns POS Digital Dining and Dinerware, discourages MLTSR from directly connecting to MAS because "full or direct integration of EMV can be daunting in terms of technical requirements as well as monetary and time investment."[24] According to Heartland, successful EMV certification requires "both the appropriate test cards and a means of capturing, logging and validating the interaction between the terminal and chip card" called "EMV test tools."[25]  The costs for test tools is "significant," "in the range of tens of thousands of dollars."[26]  In addition, the major credit card brands "have implemented fees for their EMV certification process."[27] One "kernel" configuration or connection can cost approximately $12,000 to become EMV compliant across all four major credit card brands.[28]  These costs are in addition to the tens of thousands of dollars to install the POS hardware and software discussed below.  In contrast, an integrated Interface can facilitate the EMV certifications for a cost-effective monthly fee.  Thus, EMV compliant direct connections for MLTSR POS are cost prohibitive. For these same reasons, non-integrated, stand-alone payment systems are not substitutes for an integrated POS.  Non-integrated systems

---

[22] *See* Partner With Us Save Time. Save Money.  Partner With Shift4 for EMV., Shift4 Payments, LLC,  https://www.shift4.com/m/insight/emv/ (last viewed Nov. 8, 2018).

[23] Where EMV Certification Is A Big Headache, Digital Transactions (Sept. 1, 2015), http://www.digitaltransactions.net/magazine_articles/where-emv-certification-is-a-big-headache/ (last viewed Nov. 8, 2018).

[24] *See* EMV for Application Developers, Heartland Payment Systems, https://developer.heartlandpaymentsystems.com/DataSecurity/EMVAppDevs  (last viewed Nov. 8, 2018).

[25] *Id*.

[26] *Id*.

[27] *Id*.

[28] *See id*.

**FIRST AMENDED COMPLAINT**

also invite too much data transmission error to be considered alternatives for MLTSR.[29]

**Payment Interfaces**

37.   A Payment Interface is the tool required to securely collect and transfer payment transaction data between the POS System and the MAS.  Transaction data is transferred either directly or through a third-party's Payment Interface, such those offered by Shift4 Payments and PLL.

38.   Connecting a POS System directly with a MAS provider through a customized POS network is expensive and requires sophisticated, internal technology personnel, as described above.  Such direct connections are typically used by the larger ████████████████████ that Defendants have discarded as ████████ ████████.[30]  The few MLTSR POS that allow for direct connections use outdated technology and are not EMV compliant.  As merchants continue to move towards complete EMV certification, these direct connections will become obsolete.

39.   Most MLTSR use POS Systems that connect to a MAS through a Payment Interface.  The Payment Interface acts as a conduit for transaction data and can be a gateway facilitating transmission through the internet, middleware residing on the POS System operating platform or local network, or a hybrid of the two. Payment Interfaces secure sensitive cardholder and authentication data during transmission and often store this data on behalf of merchants to reduce risk and liability.  They further mitigate risk by providing reports for reconciling transactions,

---

[29]   *See* One Last Payment Integration, Shift4 Corporation, https://www.shift4.com/pdf/S4-One-Last-Payment-Integration.pdf (last viewed Nov. 8, 2018) (Defendants discussing the benefits of an integrated Interface). Restaurant Manager merchants have also promoted the benefits of having a fully integrated system for Defendants. *See* Restaurant Manager POS at Union Jack's British Pub (Apr. 12, 2018) *available at* https://www.youtube.com/watch?v=oQbaXYhQW_0&feature=youtu.be (last viewed Nov. 8, 2018), Galway Bay Irish Pub Case Study, *available at* https://www.rmpos.com/casestudy/galway-bay-irish-pub/ (last viewed Nov. 8, 2018).

[30]   ████████████████, Shift4_00032 at 52, 84.

**FIRST AMENDED COMPLAINT**

assigning unique identifiers (tokens) to credit and debit card purchase information, providing data transmission back-up, monitoring and preventing inadvertent duplicate charges, and more. Payment Interfaces became a necessary component due to the EMV regulations described above. They allow MLTSR to be EMV compliant cost-effectively.

40. Payment Interfaces charge a fee for these services. For instance, pre-merger Restaurant Manager merchants were charged approximately $40 per month if the merchant was using a preferred Payment Interface such as PLL's Paygistix Payment Gateway. A percentage of that fee would be given to the Interface, with the remainder paid to the ISV. The fee depended in large part on whether the Interface was "neutral" or "closed." "Neutral" Interfaces, such as a pre-merger Shift4 Corp., charged the same Interface fee for data transmission irrespective of MAS and thus are payment processor agnostic. Shift4 Corp. extolled the benefits its neutral status, explaining that neutrality provides restaurant-merchants with the ability to choose and change MAS at will. A neutral Payment Interface could be a bulwark against supracompetitive fees and price hikes, putting MLTSR merchants on an "even playing field" with MAS. This was especially true with Shift4 Corp., which Defendants' ███████████████ for the deal described as ██████████ ██████████.[31] Shift4 Payments continues to represent that its Interface is "bank and processor-neutral" giving merchants "freedom to choose from nearly every major bank and processor in North America."[32]

41. MLTSR merchants do not have the necessary information to understand how Interface choice and related costs factor into POS lifecycle costs, and therefore do not factor these costs into the initial POS purchase decision. As infrequent

---

[31] ██████████████████, Shift4_00002 at 6.
[32] Partner With Us Save Time. Save Money. Partner With Shift4 for EMV., Shift4 Payments, LLC, https://www.shift4.com/m/insight/emv/ (last viewed Nov. 8, 2018); Shift4 Payments FAQs, Shift4 Payments, LLC, https://www.shift4.com/m/client/faq/#tippytop (last viewed Nov. 8, 2018).

**FIRST AMENDED COMPLAINT**

purchasers, merchants do not have the requisite experience to assess the quality and benefit of having multiple Interfaces integrated with the POS. Defendants, on the other hand, have witnessed thousands of customers' experiences and know of the pro-competitive benefits of multiple Interfaces. This asymmetric information enables Defendants to lock merchants into the POS ███████████████ and then raise prices to supracompetitive levels.

42. Pre-merger, Payment Interfaces competed for integration with POS Systems by offering POS Dealers and/or merchants enhanced integration and innovative services, and sometimes, discounts on the Payment Interface and transaction fees charged. Payment Interface providers would invest in developing unique, cutting-edge capabilities such as pay-at-the-table solutions or mobile self-checkout, among others. These services were attractive to ISVs and POS Dealers, who would then offer the choice of different features of each Payment Interface embedded in the POS System to restaurant-merchants. Competition between Payment Interfaces ensured that merchants would receive lower prices, and also spurred innovation to provide superior products, including enhanced security measures.

43. PLL's Paygistix Payment Gateway was an effective competitor in the Payment Interface market for MLTSR, providing customized, state-of-the-art services. PLL spent more than one year working with ASI to integrate its Payment Interface into the Restaurant Manager platform, providing services such as competitive chip card processing and pay-at-the-table solutions that gave Restaurant Manager competitive advantages over other POS Systems for MLTSR. In return, ASI elevated PLL to preferred Payment Interface status. What resulted is a prime example of the pro-competitive relationships between an upstream party and downstream add-on supplier/resellers. ASI enjoyed significant growth in payment processing-related income, restaurant-merchants received better and more secure integrated payment processing services at competitive prices, and as Restaurant

23

**FIRST AMENDED COMPLAINT**

Manager became increasingly demanded by merchants, so did PLL's products.

44. Pre-merger, switching Payment Interfaces was a viable option for merchants in the event of a small but significant non-transitory increase in price ("SSNIP")[33] because Lighthouse's POS System brands offered multiple Payment Interfaces, and Payment Interface switching costs are significantly less than replacing an installed POS System. Merchants with Defendant-owned POS Systems could request another interface option from the POS Dealer and move their Payment Interface services over to that new option at will.

45. But Defendants' acquisitions have changed the competitive dynamic. Their ██████████████ explains that ███████████████████████████ █████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████[34] Defendants are eliminating independent Payment Interfaces, and merchants facing a price increase will have no choice but to pay higher prices. The merger will also stifle Payment Interface innovation.

## Merchant Account Services

46. MAS are provided by Payment Processors and facilitate information exchanges between the Payment Processors, restaurant-merchants, and payment card issuers. Once Payment Processors receive information through the Payment Interface, their MAS transmit payment card and transaction data (*see* Figure 5, above) and enable funds to be deposited into the restaurant-merchant's bank account (*see* Figure 3, above). MAS providers also ensure accurate reporting, aid in the recovery of transactions, and manage risks associated with processing electronic payments.

---

[33] A "SSNIP" is a test is used to help define product markets and represents a small but significant price increase charged by firms in the candidate market for their products. The SSNIP test directs attention to the effects of price changes commensurate with those that might result from a loss to competition caused by the subject merger. The Federal Trade Commission and Department of Justice typically use a SSNIP of 5%. Horizontal Merger Guidelines, §§4.1.1 – 4.1.2.

[34] ███████████████, Shift4_00002 at 6.

24

**FIRST AMENDED COMPLAINT**

47. MAS are where payment processing companies such as Shift4 Payments earn the most revenue. MAS typically charge a fee per transaction to process electronic payments, such as between 1.5% – 4% of each patron's total bill. The revenue stream is perpetual, continuing as long as the restaurant-merchant accepts electronic payment and increasing as a restaurant increases its volume.

48. As alleged above, Lighthouse had no proprietary Payment Interface to direct revenues to its MAS prior to acquiring Shift4 Corp. Post-merger, Defendants have tied their Payment Interface and MAS products to force merchants away from independent Payment Interfaces, foreclosing competitors from accessing their POS Systems and ultimately restaurant-merchants. Besides this foreclosure, Defendants can charge supracompetitive prices for MAS because restaurant-merchants will be locked into its network.

## RELEVANT PRODUCT MARKETS

### Payment Interfaces for Defendant-Owned POS Systems for MLTSR

49. As alleged above, MLTSR require POS Systems that are customizable and serve as its hub of operations. MLTSR typically have 10 or fewer locations nationwide, two or more POS System terminals, and generate $50,000 or more in electronic payment volume per month per location. For these restaurants, the POS System represents a significant investment of time and money and is rarely switched once installed. Defendants agree that neither ███████████ ████████████████████████ are alternatives for these merchants. In selecting the Payment Interface, restaurant-merchants are limited to only those with established connections with the POS System. Defendants' contemporaneous deal documents call this merchant ████████████ ███████████████████████████████████.[35]

---

[35] ████████████████████████████ Shift4_00572 at 574; ████████ Shift4_00579 at 580.

25

**FIRST AMENDED COMPLAINT**

50. ISVs dictate which Payment Interfaces are capable of integration with their POS System Software. API access and POS System-specific functions and features must be negotiated and agreed upon. Payment Interfaces embedded in one POS System, but that do not connect with another POS System, are not interchangeable. For example, Payment Interfaces embedded into Restaurant Manager, but not POSitouch, are not substitutes. The same is true for Payment Interfaces embedded in Future POS, POSitouch and Harbortouch. Once a MLTSR installs a Defendant-owned POS System, it is ████ and limited to only those Payment Interfaces already embedded or can quickly become embedded into their respective software. Merchants' information deficit prevents them from negotiating away their ████ at the outset. For these reasons, a restaurant-merchant with a Defendant-owned POS System would not switch to a Payment Interface embedded into another POS System if faced with a SSNIP. Therefore, a hypothetical monopolist in the Payment Interface market for Defendant-owned POS Systems for MLTSR would find it profitable to impose a SSNIP, making this a distinct relevant product market. Although Payment Interfaces integrating with each Restaurant Manager, Future POS, POSitouch and Harbortouch could serve as individual product markets, it is appropriate to consider the acquisitions' effect across this entire cluster of Payment Interfaces because Payment Interfaces integrating with this group of POS Systems face similar competitive conditions.

### Payment Interfaces for POS Systems Specializing in MLTSR

51. Payment Interfaces for MLTSR POS Systems also constitute a distinct product market. Due to the necessary level of customization and outside technological support, ISVs develop POS Systems specifically for MLTSR, and those systems require MLTSR-compatible Payment Interfaces. Defendants' deal documents confirm that ████████████████████████████████████ ████████████████████████████████████[36] Payment Interfaces

---

[36] ████████████████, Shift4_00032 at 52.

**FIRST AMENDED COMPLAINT**

designed for other segments of the restaurant industry do not have the connections and integration necessary to service the MLTSR market and therefore are not viable substitutes. Direct connections to MAS either use obsolete technology and cannot thwart against data theft liability, or are too costly to become EMV compliant and prevent against data theft liability. Non-integrated (or stand-alone) payment systems lack the functionality MLTSR merchants need. These are also not viable alternatives. A hypothetical monopolist in the Payment Interface market for MLTSR POS would find it profitable to impose a SSNIP, making this a distinct relevant product market. As with the narrower Payment Interface for Defendant-owned POS product market, it is appropriate to consider the acquisitions' effect across this entire cluster of Interfaces as well because the underlying competitive dynamics that determine the likelihood that competition will be adversely impacted apply to all POS systems for MLTSR.

## RELEVANT GEOGRAPHIC MARKET

52. The United States is the relevant geographic market for Payment Interfaces for Defendant-owned POS Systems and Payment Interfaces for POS Systems specializing in MLTSR.

## LIGHTHOUSE'S ACQUISITIONS ARE ANTICOMPETITIVE

53. Prior to 2014, competition in the relevant product markets was vibrant. MLTSR merchants had several options for POS Systems, including Aloha POS (owned by NCR), Micros, Digital Dining, Dinerware, Harbortouch, Restaurant Manager, POSitouch, Future POS, Focus POS and Maitre'D. Many of the POS Systems offered multiple Payment Interfaces, allowing restaurant-merchants choices for Payment Interface and MAS.

54. Competition was further enhanced because several Payment Interfaces, including Shift4 Corp.'s, were "neutral" and further enhanced merchant choice, in contrast to closed Payment Interfaces. As a result, merchants could switch to alternative Payment Interfaces (and potentially MAS) while maintaining full

27

<strong>FIRST AMENDED COMPLAINT</strong>

functionality of the POS System if faced with a SSNIP.



55.   Then, the MLTSR POS System market underwent significant consolidation.  Acquisitions by payment processors increased the number of closed POS System-Payment Interface-MAS networks. In 2014 and 2015, payment processor Heartland[37] acquired Digital Dining and Dinerware.  These POS Systems became essentially unavailable for independent Payment Interfaces such as PLL.  In 2014, Oracle acquired Micros and de-emphasized its presence in the MLTSR market.

56.   In August 2017, Lighthouse acquired ASI and its Restaurant Manager POS System.  It then contrived to eliminate competition in Payment Interfaces by restricting POS Dealers' promotion of non-Lighthouse-affiliated Payment Interfaces, such as PLL.

57.   In the Fall of 2017, Lighthouse acquired two additional POS Systems serving MLTSR: Restaurant Data Concepts, Inc. and its POSitouch POS System, and Future POS, Inc. and its Future POS System.  These acquisitions significantly increased Lighthouse's market share, to approximately 35%. According to Defendants' ███████████████, those three acquisitions allow it to █████████

---

[37] Heartland was subsequently acquired by Global Payments, Inc.

28

**FIRST AMENDED COMPLAINT**

[REDACTED]

[REDACTED]

[REDACTED] [38] For comparison, pre-August 2017 and with Harbortouch as its sole POS System, Lighthouse's market share was around 3%. The firms comprising the remaining 65% market share include few firms that allow for independent Payment Interface integration. Defendants' POS market share has only grown since first initiating this action. In Summer 2018, Defendants announced partnerships with Posera and, separately, with Micros.[39] These quasi-mergers eliminate any potential competition between them and Defendants.

58. Then, in January 2018, Lighthouse announced the Shift4 Corp. acquisition that provided the structural change necessary to negatively affect competition. Lighthouse CEO Jared Isaacman called the transaction [REDACTED]

[REDACTED][40]   Defendants'

[REDACTED] aimed to put Defendants [REDACTED]

[REDACTED]

[REDACTED][41]   CEO Isaacman directed employees [REDACTED]

[REDACTED]

[REDACTED].[42]   The [REDACTED] expressly contemplated

[REDACTED]

[38] [REDACTED], Shift4_00002 at 6.
[39] See Shift4 Payments and Posera Announce Merchant Services Solution for Restaurants, Shift4 Payments, LLC, (June 21, 2018), https://www.shift4.com/m/company/newsroom/press.cfm?article=pr-s4-posera-msp-restaurants.cfm (last viewed Nov. 8, 2018); We've Redefined What an Integrated Solution Can Be, Shift4 Corporation, https://www.shift4.com/pdf/Shift4-Oracle-Co-Brand-Slick.pdf (last viewed Nov. 8, 2018).
[40] [REDACTED] Shift4_000500 at 501.
[41] [REDACTED], Shift4_0002 at 6, 7, 22, 25; [REDACTED] Shift4_00500 at 501, 503.
[42] [REDACTED] Shift4_00572 at 574; [REDACTED] Shift4_00579 at 580.

29

**FIRST AMENDED COMPLAINT**

██████████████████████████████████████.[43]   CEO Isaacman told his company that ███████████████████████████████████████████████[44] His professed ████████████████████████████████████████████████████████████ ██████████████████████████████[45]

59.   Defendants' plan is facilitated by their ███████████████████████. CEO Isaacman's █████████████████████████████████████████████████ █████████████████████████████████████████████████████.[46] He ordered employees to ████████████████████████████████████████████████ █████████████████████████████.[47] One POS Dealer reported that they are being offered significant financial incentives such a signing bonuses, waived fees, upcharges and higher monthly payments. Another reported that a Shift4 Payments executive threatened to allow another POS Dealer to encroach on his sales territory and poach customers.

60.   Defendants intend to ███████████████████████████████████. Independent, Shift4 Corp. had yet to make significant inroads to the MLTSR market with a market share of less than 10%. According to Defendants' deal documents, its

[43] ████████████████████████, Shift4_00002 at 7.

[44] ██████████████████████████████████████ Shift4_00540 at 541-542. ████████████████████████████████ Shift4_00572 at 574; ████████████████████ Shift4_00579 at 580. ████ Shift4_003████████████████████

██████████████████████████ Shift4_000547 ████████████████████████████████ Shift4_000556 at 558-560 ████████████████

[45]

██████████████████████████████████ Shift4_00572 at 574 ████████████████████

[46] █████████████████████████████████████████████ Shift4_00540 at 541-542; ████████████ Shift4_00572 at 574-

30

**FIRST AMENDED COMPLAINT**

Interface was ███████████████████████████[48] Thus, Shift4 Corp. could have independently increased its MLTSR market presence and offered merchants lower prices.   The Department of Justice and Federal Trade Commission call such disruptive firms "mavericks."[49]   Their elimination is viewed as evidence of a merger's anticompetitive harm.[50]   But, rather than realize cost savings, Defendants will first ███████████████████████████████[51] and then ████████████████████████████████████████████████████████ ████████████████████ ██████████████████████████████ ██████████████████████████████████████[53]   According to CEO Isaacman, ██████████████████████████████████████ ████████████████████████████[54]  Within the ████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████████████████[55] All merchants using Defendants' POS will have Interface choice eliminated, be forced to use the Shift4 network, and will be subjected to higher prices. Defendants' market share could grow to at least 40%.[56]  Merchants are ██████ or locked into the Shift4 Payments network and are unable to protect themselves from price increases. Independent Payment Interfaces such as PLL are being foreclosed from accessing the

_____

[48] ███████████████████, Shift4_00002 at 6.
[49] Horizontal Merger Guidelines, §2.1.5.
[50] *Id*.
[51] ████████████████████ Shift4_00002 at 6, 7, 22, 25; ██████████████ ████████ Shift4_00572 a ████████████████████████ ████████████ ████████████████████████████ Shift4_00579 a
[52] ████████████████████████████████████████████ Shift4_00092 at 105-106, 132.
[53] ██████████████████, Shift4_00002 at 7.
[54] ████████████████████████████████████████████ ██████████████████ Shift4_00395-397.
[55] ██████████████████ Shift4_00002 at 25.
[56] Naturally, its market share for Payment Interfaces for Defendant-owned POS Systems will be virtually 100%.

31

**FIRST AMENDED COMPLAINT**

volume of merchants necessary to stay in the relevant markets.





32

**FIRST AMENDED COMPLAINT**

61.   Defendants' plans have come to fruition.  Defendants' purchase order forms, effective February 1, 2018, provide new Interface fees of $25 per month plus $0.03 per transaction to merchants using independent Interfaces, such as PLL.  These fees are almost double pre-merger prices.  POS Dealers report that these same merchants are being charged at least $200 more per Restaurant Manager software license, potentially more depending on the POS Dealer's markup.  POS Dealers are also reporting that, beginning May 1, 2018, all merchants installing a new Defendant-owned POS – whether brand new merchants are existing merchants enhancing their system – will be required to use the Shift4 Payments Interface, regardless of the merchants' current payment processor.  POS Dealers are forced to install Defendants' Interfaces.  They cannot provide unbiased opinions on the benefits of Defendants' Interface competitors.  They are unable to offer software discounts.  They are forced to either absorb or pass through Defendants' higher fees for processing payments outside of Shift4 Payments and are losing revenue.  The price hikes apply to all merchants, whether new or pre-existing customers.  The POS Dealers that resist are experiencing deteriorating relationships with existing customers, who do not understand why they are suddenly being charged higher prices.

62.   Post-merger, POS Dealers are beholden to Defendants and, at their direction, are offering no alternatives.  POS Dealers are receiving emails from Defendants offering the monetary incentives described above.  According to Shift4 Payments' February 1, 2018, purchase order forms, POS Dealers may waive all Interface and licensing fees and offer reduced POS hardware costs to merchants who switch to Defendants' network.  But, the waived Interface and software fees "can be marked up and 100% of the fee over cost is given to the reseller.  The reseller can also charge a setup fee that is paid 100% to the dealer."[57]   One merchant was told by its POS Dealer that PLL was no longer an option for processing; that merchant

_____

[57] Shift4 Gateway is available for new merchants!!!, Restaurant Manager Admin & Operations.  *See* Dkt. No. 25-12.

**FIRST AMENDED COMPLAINT**

switched to Defendants' Interface. Industry sources indicate that competitors are going to be written out of Defendants' upgraded systems or new software versions. Independent Interfaces such as PLL cannot compete by internally absorbing the additional tolls and transaction fees to remain a cost-competitive alternative. If they cannot access Defendant-owned POS System accounts, they will be forced to exit the relevant product markets. Merchants did not know that Defendants would be eliminating Interface choice and raising their fees when selecting the POS to protect against being locked in.



63. This harm to competition is compounded by the effects of Shift4 Payments' foreclosure of competition in the Payment Interfaces for MLTSR POS Systems market. Defendants' tolls are diminishing PLL's and other Payment Interfaces' revenues from Defendant-owned POS System accounts and has caused them to lose customers; as more leave, they will be deprived of the necessary scale to continue to operate. Competitors are unable to raise new capital to expand lines of business and are experiencing employee attrition. For companies such as PLL, the

34

**FIRST AMENDED COMPLAINT**

remaining Payment Interface customer base is not sufficient to cover fixed costs. Based on pre-merger prices and margins, and current trends in revenues and new client acquisitions, PLL will be unable to maintain its minimum viable scale. Other Payment Interfaces providers for POS Systems specializing in MLTSR likely have similar fixed costs and unit margins as well as similar trends in sales and revenues.

64. Thus, because of the merger, PLL and its competitors are being foreclosed of their ability to sell and service Interfaces for Defendant-owned POS Systems and cannot remain in the relevant markets, which will allow Shift4 Payments to obtain monopoly power – become the ███████████████████ in Defendants' words.[58] Defendant POS customers have no choice but to use Shift4 Payments' Interface. Shift4 Payments will be able to increase prices to all merchants by at least ███████████████,[59] if not up to the cost for restaurant-merchants to switch POS Systems or build a proprietary Payment Interface, both of which are cost prohibitive. Defendants may also be able to increase MAS prices up to the cost of switching systems or developing a proprietary Interface. Shift4 Payments will also have diminished incentives to invest in innovation.

65. Without independent Payment Interfaces in the relevant markets, Shift4 Payments will be able to leverage its market power into markets for Interfaces for other types of POS Systems. For example, if Shift4 Corp. and PLL competed to provide Payment Interfaces for a third-party's POS System, eliminating PLL would eliminate a competitor in that other market. This will likely adversely affect competition in the market for Payment Interfaces for the third-party POS Systems, and could allow Shift4 Payments to charge supracompetitive prices for Interfaces for third-party POS Systems as well.

66. If Payment Interface competition is eliminated from the relevant markets,

---

[58] ███████████████, Shift4_00002 at 6.
[59] ████████████████████████████ Shift4_00092 at 105-106.

**FIRST AMENDED COMPLAINT**

the only remaining option for merchants wanting to switch Payment Interfaces or MAS in the face of a price increase would be to choose a different locked-in POS System network.  The processor-owned locked-in POS Systems would then be able to unilaterally raise payment processing prices, knowing that merchants will not invest the significant time and money needed for new hardware, software, services, training and customer retention to replace the entire POS System.  Innovation would also suffer.  As discussed above, PLL strategically differentiated itself as a Payment Interface provider by developing cutting-edge products, including those related to data security and operations.  If PLL and others are removed from the market, Shift4 Payments (and the remaining Payment Processors) will have no incentive to continue to develop enhanced Payment Interface offerings including payment security features even as technology – and the ability to compromise data – advances.  Consumers' data will be at risk. PLL requested post-merger conduct changes to mitigate these effects but Defendants refused.

67.    The prospective harm to competition described above is highly plausible based on Defendants' contemporaneous business records confirming the scheme described above.  It is also already occurring in other markets, such as the market for Payment Interfaces serving major lodging establishments in the United States.  Pre-merger, Shift4 Corp. made significant headway into the market by promoting its Payment Interface's neutrality status to Property Management Systems ("PMS"),[60] gaining a market share in excess of 50% and locking-in their customer base.  Post-merger, with PMS, Payment Interfaces, and MAS under one umbrella, Defendants have begun exploiting their lock-in market power by offering revenue-sharing incentives to ISVs and PMS Dealers and Payment Interface discounts to drive business to the Shift4 Payments conglomerate.  They have removed ISVs' and PMS Dealers' incentives to encourage Payment Interface options and dealers, disabling

---

[60] PMS are the lodging establishment equivalent of POS Systems.

**FIRST AMENDED COMPLAINT**

Payment Interface competitors. Once competition is eliminated and Payment Interface accounts locked into the Shift4 Payments network, Shift4 Payments will have the ability to recoup revenue-sharing costs by raising prices on MAS.

68. Another industry impacted relates to motorcycle and accessory sellers, which use a Dealer Management System ("DMS"), similar to a POS or PMS. The DMS is also an expensive investment and merchants are locked in upon purchase. According to DMS merchant The Ranch Harley Davidson, pre-merger, its only Interface option was Shift4 Corp. but, because Shift4 Corp. was neutral, it processed payments through the MAS of its choosing. The Ranch Harley Davidson found alternatives, such as Heartland, to be low-cost providers. After the merger, Defendants increased merchants' prices to use Heartland significantly. The Ranch Harley Davidson was forced to switch over to the Shift4 network against their will; it firmly believe costs will increase in the near future. Merchants are trapped and will be forced to pay higher transaction fees, much like MLTSR merchants will be. Defendants' conduct must be stopped in its tracks.

## NEW ENTRY IS UNLIKELY

69. It is difficult for new firms to enter the market for Payment Interfaces for Defendant-owned POS Systems for MLTSR.

70. Integration with POS Systems is time consuming and technically difficult, particularly in light of EMV compliance. The Payment Interface must develop a relationship with the ISV, get access to API, and be allowed to create and embed its Payment Interface into the POS System. Then the Payment Interface must expend considerable time and specialized knowledge to code the Payment Interface to fit and enhance the POS System's existing features and functionality. Access to APIs must be negotiated and agreed upon. Negotiating EMV compliance can take several months. Developers need assurances that POS Dealers will market their products to end-users. It took over one year for PLL to customize and fully integrate its Payment Interface with Restaurant Manager, and significant resources and

37

**FIRST AMENDED COMPLAINT**

proprietary knowledge to enable the programs to work together.

71.   Payment Interfaces are also unlikely to enter the relevant markets without a prior commitment from Defendants that integration will not only be allowed, but also promoted.  Because of Shift4 Payments' new policy to ███████ ████████████████████████████████████████████████████ [61] ██████ ████████████████████████████████████████████████████████████ ████████, the company likely will not grant access to new entrants or nascent Payment Interface competitors.

72.   For these same reasons, Payment Interfaces are unlikely to enter the market of POS Systems for MLTSR.  It is equally costly and time consuming to integrate with the remaining POS Systems serving MLTSR, and access and integration must similarly be negotiated and agreed upon.  Entry into the market of Payment Interfaces for POS Systems specializing in MLTSR is unlikely.

### FIRST CLAIM FOR RELIEF

**Clayton Act, Section 7, 15 U.S.C. §18**
**(Against All Defendants)**

73.   PLL hereby incorporates by reference paragraphs 1-72 above, as though alleged fully herein.

74.   The transaction between Lighthouse and Shift4 Corp. is likely to substantially lessen competition in the relevant product markets in violation of Section 7 of the Clayton Act, 15 U.S.C. §18.

75.   For reasons described above, the relevant product markets include at least Payment Interfaces for Defendant-owned POS Systems for MLTSR, requiring integration, connection, and access to the Restaurant Manager, Future POS, POSitouch, and Harbortouch POS Systems, and Payment Interfaces for POS Systems

---

[61] ████████████████████ ████████████████████████████████ Shift4_00572 at 574; ██████████ ███████ Shift4_00579 at 580; ████████ ████████████████████████████████████ Shift4_00395-397.

**FIRST AMENDED COMPLAINT**

specializing in MLTSR.   The relevant geographic market for these Payment Interfaces is the United States.

76.   Foreclosure is likely to occur in the market of Payment Interfaces for Defendant-owned POS Systems for MLTSR and Payment Interfaces for POS Systems specializing in MLTSR in the manner described above.  If allowed to merge, Defendants will acquire sufficient market power to force competitors such as PLL to exit the Payment Interface market for MLTSR, thereby reducing customer choice and ultimately enabling Defendants to charge merchants supracompetitive prices.

77.   Barriers to entry are high, and new entry is neither likely, timely, or sufficient to replace the competition lost as a result of the acquisition.

78.   The transaction is likely to harm competition as well as consumers.

79.   The transaction is likely to force PLL to exit the relevant product markets, thereby directly injuring PLL in its business.

80.   Because the injury to PLL's business flows directly from the harm to competition likely to result from this acquisition, the injury to PLL constitutes antitrust injury.

81.   The injury likely to be inflicted on PLL as a result of the merger would cause irreparable harm to its business, entitling PLL to injunctive relief.   PLL requested post-merger behavioral changes by Defendants to mitigate the competitive harms alleged herein to no avail, thereby necessitating the instant action and the relief sought.  PLL has no adequate remedy at law.

<u>**SECOND CLAIM FOR RELIEF**</u>
**Attempted Monopolization in Violation of the Sherman Act, Section 2**
**15 U.S.C. §2**
**(Against All Defendants)**

82.   PLL hereby incorporates by reference paragraphs 1-81 above, as though alleged fully herein.

83.   As discussed above, the relevant product markets include at least Payment Interfaces for Defendant-owned POS Systems for MLTSR, requiring

**FIRST AMENDED COMPLAINT**

integration, connection, and access to the Restaurant Manager, Future POS, POSitouch and Harbortouch POS Systems, and Payment Interfaces for POS Systems specializing in MLTSR. The geographic market for these Payment Interfaces is the United States.

84. By engaging in the acts described above, Defendants have attempted to monopolize the markets for Payment Interfaces for Defendant-owned POS Systems for MLTSR and Payment Interfaces for POS Systems specializing in MLTSR. Defendants specifically attempted to monopolize the relevant markets and did so through willful acquisition of that monopoly power in the relevant markets, as distinguished from growth or development as a result of a superior product, business acumen, or historical incident. Defendants have a dangerous probability of succeeding in monopolizing the relevant markets, as post-merger they stand to hold a market share of at least 40% for Payment Interfaces for POS Systems specializing in MLTSR, and between 30% - 40% of the POS Systems serving that market segment, if the merger is allowed to proceed without concessions and Shift4 Payments allowed to carry out the conduct described above, including eliminating independent Payment Interfaces from the relevant markets. In addition, for reasons discussed above, the relevant markets are characterized by significant entry barriers, with new firms unlikely to be able to enter in a timely, sufficient manner to effectively compete with, and serves as a constraint on prices for Shift4 Payments.

85. Such conduct constitutes attempted monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. §2.

86. Such conduct has caused, and will cause, harm to consumers and competition, reducing output and raising prices.

87. Such conduct is substantially likely to directly and proximately cause PLL irreparable harm, and thus PLL will suffer antitrust injury of the type that the antitrust laws were designed to prevent.

**FIRST AMENDED COMPLAINT**

## THIRD CLAIM FOR RELIEF
### Monopolization in Violation of the Sherman Act, Section 2
### 15 U.S.C. §2
### (Against All Defendants)

88. PLL hereby incorporates by reference paragraphs 1- 87 above, as though alleged fully herein.

89. As discussed above, the relevant product markets include at least Payment Interfaces for Defendant-owned POS Systems for MLTSR, requiring integration, connection, and access to the Restaurant Manager, Future POS and POSitouch POS Systems, and Payment Interfaces for POS Systems specializing in MLTSR. The relevant geographic market for these Payment Interfaces is the United States

90. By engaging in the acts described above, Defendants have monopolized the markets for Payment Interfaces for Defendant-owned POS Systems for MLTSR and Payment Interfaces for POS Systems specializing in MLTSR. The acquisitions were willful acquisitions of that monopoly power in the relevant markets, as distinguished from growth or development as a result of a superior product, business acumen, or historical incident. For reasons discussed above, the relevant markets are characterized by significant entry barriers, with new firms unlikely to be able to enter in a timely, sufficient manner to effectively compete with and serve as a constraint on prices for Shift4 Payments.

91. Such conduct constitutes monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. §2.

92. Such conduct has caused and will cause harm to consumers and competition, reducing output, and raising prices.

93. Such conduct is substantially likely to directly and proximately cause PLL irreparable harm, and thus, PLL will suffer antitrust injury of the type that the antitrust laws were designed to prevent.

41

**FIRST AMENDED COMPLAINT**

## FOURTH CLAIM FOR RELIEF
### Tying in Violation of the Sherman Act, Section 1
### 15 U.S.C. §1

### (Against All Defendants)

94. PLL hereby incorporates and references paragraphs 1 – 93 above, as though alleged fully herein.

95. Defendants' POS, Payment Interface and MAS are separate products.

96. Defendants have market power in the MLTSR POS System market by virtue of its four ██████ brands, Harbortouch, Restaurant Manager, FuturePOS and POSitouch, which have enabled them to be a ███████████████████████████████████████████████ [63]

97. Defendants are now tying the two products together, requiring that merchants use their Interface with their POS. Merchants have no choice but to use Defendants' Interface when installing new POS units.

98. The above-described unlawful tying forecloses a substantial volume of commerce. Competing Interfaces will be deprived of several million dollars of revenue if no longer maintained as alternatives to Defendants' Interface.

99. Such conduct is substantially likely to directly and proximately cause PLL irreparable harm, and thus, PLL will suffer antitrust injury of the type that the antitrust laws were designed to prevent.

100. The tying arrangement described herein constitutes a *per se* violation of Section 1 of the Sherman Act.

### PRAYER FOR RELIEF

WHEREFORE, PLL seeks the following relief:

A. A declaration that Lighthouse's acquisitions of Action Systems. IncI/Restaurant Manager, Future POS Inc/FuturePOS, Restaurant Data Concepts, Inc./POSitouch and Shift4 Corp. violate Section 7 of the Clayton Act, 15 U.S.C. §18;

---

[62] ██████████████████, Shift4_00002 at 6.
[63] ██████████████████, Shift4_00032 at 52.

**FIRST AMENDED COMPLAINT**

B.    A declaration that Defendants' conduct constitutes attempted monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. §2;

C.    A declaration that Defendants' conduct constitutes monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

D.    A declaration that Defendants' conduct constitutes tying in violation of Section 1 of the Sherman Act, 15 U.S.C. §1;

E.    An order preliminarily enjoining Defendants from carrying out the planned acquisition of Shift4 Corp. by Lighthouse, or any other transaction or agreement that would allow these two companies to combine, and requiring Defendants to hold all assets separate during the pendency of this litigation;

F.    An order permanently enjoining Defendants from carrying out the planned acquisition of Shift4 Corp. by Lighthouse, or any other transaction or agreement that would allow these two companies to combine;

G.    An order requiring Shift4 Payments to divest such assets as necessary to restore the competitive conditions that existed prior Lighthouse's acquisition of Shift4 Corp.;

H.    The award to Plaintiff of three-fold the damages caused by Defendants' antitrust violations as alleged herein;

I.    An order awarding reasonable attorneys' fees and costs of this suit; and

J.    Such other further and permanent equitable relief as may be reasonably likely to cure the harm to competition caused by this merger, or that this Court deems just and proper.

Dated: November 9, 2018

/s/ *Jodie M. Williams*
Daniel J. Mogin (Bar No. 95624)
Jodie M. Williams (Bar No. 247848)
Jennifer M. Oliver (Bar No. 311196)
**MOGINRUBIN LLP**
600 W. Broadway, Suite 3300
San Diego, CA 92101
T: 619-687-6611

43

**FIRST AMENDED COMPLAINT**

F: 619-687-6610
dmogin@moginrubin.com
jwilliams@moginrubin.com
joliver@moginrubin.com

Jonathan L. Rubin
(*Pro hac vice*)
(D.C. Bar No. 353391)
**MOGINRUBIN LLP**
1615 M Street, NW, Third Floor
Washington, D.C. 20036
T: 202-630-0616
F: 877-247-8586
jrubin@moginrubin.com

*Counsel for Plaintiffs*

44

**FIRST AMENDED COMPLAINT**

## **JURY DEMAND**

Plaintiff Payment Logistics Limited demands a trial by jury for all claims of relief so triable.


Dated: November 9, 2018

/s/ *Jodie M. Williams*
Daniel J. Mogin (Bar No. 95624)
Jodie M. Williams (Bar No. 247848)
Jennifer M. Oliver (Bar No. 311196)
**MOGINRUBIN LLP**
600 W. Broadway, Suite 3300
San Diego, CA 92101
T: 619-687-6611
F: 619-687-6610
dmogin@moginrubin.com
jwilliams@moginrubin.com
joliver@moginrubin.com


Jonathan L. Rubin
(*Pro hac vice to be applied for*)
(D.C. Bar No. 353391)
**MOGINRUBIN LLP**
1615 M Street, NW, Third Floor
Washington, D.C. 20036
T: 202-630-0616
F: 877-247-8586
jrubin@moginrubin.com

*Counsel for Plaintiffs*

**FIRST AMENDED COMPLAINT**