Daniel J. Mogin (SBN 95624)
Jennifer M. Oliver (SBN 311196)
**MOGINRUBIN LLP**
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 687-6611
Facsimile:  (619) 687-6610
dmogin@moginrubin.com
joliver@moginrubin.com

Jonathan L. Rubin (*Pro hac vice*)
**MOGINRUBIN LLP**
1615 M Street, NW, Third Floor
Washington, D.C. 20036
T: 202-630-0616
F: 877-247-8586
jrubin@moginrubin.com

*Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Payment Logistics Limited,<br><br>          Plaintiff,<br><br>     v.<br><br>Lighthouse Network, LLC, Shift4 Corporation, Shift4 Payments, LLC, and Merchant Link, LLC,<br><br>          Defendants. | Case No. 18-cv-00786-L-AGS<br><br>**SECOND AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL ANTITRUST LAWS 15 U.S.C. § 18, 15 U.S.C. § 2**<br><br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

GLOSSARY ......................................................................................................... ii

NATURE OF THE ACTION ...................................................................................1

JURISDICTION AND VENUE ..............................................................................11

PARTIES ..............................................................................................................11

PAYMENT PROCESSING INDUSTRY ...............................................................13

    Point-of-Sale Systems.......................................................................................14

        A. POS Hardware ...................................................................................... 14

        B. POS Software ........................................................................................ 14

        C. MLTSR POS Dealers ............................................................................ 15

        D. POS Systems for MLTSR ..................................................................... 16

    Payment Interfaces...........................................................................................26

    Merchant Account Services ..............................................................................29

RELEVANT PRODUCT MARKETS .....................................................................30

    Payment Interfaces for Defendant-Owned POS Systems for MLTSR ..............30

    Payment Interfaces for POS Systems Specializing in MLTSR..........................31

LIGHTHOUSE'S ACQUISITIONS ARE ANTICOMPETITIVE.......................32

NEW ENTRY IS UNLIKELY ...............................................................................48

FIRST CLAIM FOR RELIEF ................................................................................50

    Clayton Act, Section 7, 15 U.S.C. §18 ............................................................50

SECOND CLAIM FOR RELIEF............................................................................52

    Attempted Monopolization in Violation of the Sherman Act, Section 2 15 U.S.C. §2 52

THIRD CLAIM FOR RELIEF................................................................................53

    Monopolization in Violation of the Sherman Act, Section 2 15 U.S.C. §2 .......53

FOURTH CLAIM FOR RELIEF............................................................................54

    Tying in Violation of the Sherman Act, Section 1 15 U.S.C. §1 .......................54

PRAYER FOR RELIEF ........................................................................................55

JURY DEMAND....................................................................................................57

TABLE OF CONTENTS

# GLOSSARY

**PLL:**  Payment Logistics Limited, Plaintiff in this action; a full-service payment integration technology company focusing on providing payment processing interfaces ("Payment Interfaces") and merchant account services ("MAS") to mid-to-large table-service restaurants ("MLTSR").

> **Paygistix Payment Gateway.**  Payment Interface developed by PLL for Point-of-Sale Systems ("POS Systems") specializing in MLTSR.

**Shift4 Payments:**  Shift4 Payments, LLC, Defendant in this action; the entity resulting from Lighthouse's acquisition of Shift4 Corporation ("Shift4 Corp.").

> **Merchant Link, LLC:** Merchant Link, Defendant in this action; pre-merger, offered "neutral" independent Payment Interface; Merchant Link was acquired by Shift4 in September 2019.

> **Shift4 Corp.:**  Shift4 Corporation, Defendant in this action; pre-merger, offered a "neutral" independent Payment Interface; Shift4 Corp. was acquired by Lighthouse Network, LLC in January 2018.

> **Lighthouse:**  Lighthouse Network, LLC, Defendant in this action; a financial services organization offering integrated payment processing and point-of-sale products that acquired Shift4 Corp., Action Systems Inc. ("ASI"), Future POS, Inc. and Restaurant Data Concepts, Inc.

>> **Harbortouch:**  POS System for MLTSR developed by Lighthouse.

>> **ASI:**  Action Systems, Inc.; an Independent Software Vendor ("ISV") that developed Restaurant Manager and was acquired by Lighthouse in August 2017.

>> **Restaurant Manager:**  A POS System for MLTSR developed by ASI and acquired by Lighthouse in August 2017.

>> **Future POS, Inc.:**  ISV which developed a POS System called Future POS and was acquired by Lighthouse in Fall 2017.

>> **Future POS:**  POS System for MLTSR developed by Future POS, Inc. and acquired by Lighthouse in Fall 2017.

>> **Restaurant Data Concepts, Inc.:**  ISV which developed the POSitouch POS System and was acquired by Lighthouse in Fall 2017.

GLOSSARY

**POSitouch:** POS System for MLTSR developed by Restaurant Data Concepts, Inc. and acquired by Lighthouse in Fall 2017.

**Defendant-owned POS Systems**: POS Systems owned by Lighthouse prior to the Shift4 Corp. acquisition, including Harbortouch, Restaurant Manager, Future POS and POSitouch.

**Direct-to-MAS Network:** A legacy connection between a POS System and a MAS Network that transmits electronic payment card data from the POS System directly to the MAS Network (and back again). None of the Direct-to-MAS Network connections found in POS Systems that cater to MLTSR have support for the EMV standard nor do they have support for modern cardholder data security features like tokenization. Instead, they exist as antiquated connections that pre-date the EMV liability shift which took place in October 2015. Any support for Direct-to-MAS Network connections provided by ISVs is only to maintain continuity for their MLSTR customers until those customers can upgrade their POS System to support the EMV standard.

**EMV (Europay, Mastercard, and Visa):** The global standard for security and acceptance of chip-based debit and credit cards.

**Gateway:** Network that provides access to other networks and enables transmitted data to use its routing paths; Payment Gateway is synonymous with Payment Interface.

**Payment Interface or Interface:** Type of Interface that transmits electronic payment card data from the POS System to the MAS Network (and back again) while providing increased data security and related services. All Payment Interface providers catering to the MLTSR market support the EMV standard.

**Closed Payment Interface:** Type of Payment Interface dedicated to a MAS provider (and, sometimes, POS System) and charges additional fees or "tolls" to use a MAS provider outside of the network.

**Neutral Payment Interface:** Type of Payment Interface capable of integrating with multiple MAS Networks and that charges the same fee for data transmission or makes its Payment Interface available for use under similar terms irrespective of the MAS provider.

**Application Programming Interface ("API"):** Type of interface that simplifies the computer programming process and can act as a bridge between an application and the computer's operating system.

iii

**GLOSSARY**

**ISV:** Independent Software Vendor; a POS System developer that creates a POS System.

**Kiosk (or Terminal):** Hardware that resides in the restaurant and contains the POS System Software programs, including the Payment Interface.

**Merchant Account Services ("MAS"):** A service that enables merchants to accept credit and debit card payments by managing electronic payment card information and funds exchanges between merchant banks and card issuing banks. MAS providers rely on MAS Networks to deliver their services.

**MAS Network:** The network that MAS providers utilize to connect to the card brands, such as Visa, Master Card, American Express, Discover and others, for authorization and settlement of electronic payment transactions. Payment Interfaces connect to MAS Networks.

**Mid-to-Large Table-Service Restaurants ("MLTSR"):** Segment of food and beverage establishments that typically have 10 or fewer locations nationwide, two or more POS System terminals, and generate $50,000 or more in average monthly electronic payment volume per location. The Defendant-owned POS Systems specialize in MLTSR.

███████████████████████████████████████████

**Enterprise restaurants:** Food and beverage establishments with more than ten locations throughout the United States.

**Quick-serve counter-service restaurants:** Restaurants with limited menu offerings where order placement is at the counter with few to no wait staff.

**Middleware:** A type of software interface installed on a local network that connects local applications or systems with external applications or systems.

**Payment Processor:** A MAS provider appointed by a merchant to enable credit and debit card acceptance and funding.

**POS or POS System:** Point-of-Sale System; a technological solution comprised of hardware, software and support services that is instrumental in managing MLTSR operations.

**POS Hardware:** Kiosks or terminals and sometimes handheld devices that reside in the restaurant and contain POS System Software programs.

iv

**GLOSSARY**

**POS Software:** Programs within the POS System that enable order placement, table management, employee time tracking and management, management reporting on staff productivity, financial operations management, menu item performance, inventory tracking, and payment processing, among other things.

**POS Services:** External technology personnel that ensure that the POS System functions properly. These services generally include the installation and configuration of POS System, merchant training, and ongoing merchant support.

**POS Dealer (or VAR or Reseller):** Sells POS and Interfaces to merchants and acts as the intermediary between the merchant and ISV. The POS Dealer is often the sole point-of-contact with the merchant and is responsible for presenting all POS and integrated Interface options to the merchant.

**Tokenization:** Process through which a Payment Interface substitutes sensitive cardholder and authentication data with non-sensitive reference data, called a token, and which can be stored by the merchant and used to perform later transactions.

**GLOSSARY**

Plaintiff Payment Logistics Limited, based on knowledge as to itself and its own acts and on information and belief as to all other matters, and, demanding trial by jury, brings this civil action under Section 7 of the Clayton Act, 15 U.S.C. §18, Section 2 of the Sherman Act, 15 U.S.C. §2, and  Section 1 of the Sherman Act, 15 U.S.C. §1, to preliminarily and permanently enjoin Lighthouse Network, LLC's acquisition of Shift4 Corporation, to preliminarily and permanently enjoin Shift4 Payment's acquisition of Merchant Link, and prevent the combined company from monopolizing, attempting to monopolize, and unlawfully tying products in the relevant markets.

## NATURE OF THE ACTION

1.    This case involves conduct well known in antitrust jurisprudence.  An upstream party, such as a manufacturer, needs add-on suppliers/resellers to reach end-users, develop a new market, establish a presence in that market, customize the product to meet customer needs, or offer aftermarket services.  It engages add-on suppliers and value-add resellers to such a degree that their products or services are viewed as unified by the end-users.  These downstream suppliers and resellers compete against one another resulting in lower prices, enhanced services, and improved product quality.  Then, once the customer base is locked-in and essentially unable to switch to a competing product/service, the upstream party tries to monopolize the market by cutting out the downstream parties, claiming it is offering efficiencies while actually positioning itself to unilaterally raise prices and exert market power against a locked-in customer base.  Downstream competition withers, customers are left with no alternatives but to pay the manufacturer's higher prices, and innovation suffers.  *Eastman Kodak v. Image Technical Services*, 504 U.S. 451 (1992) and *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) are illustrative, real-world examples of this series of events.  Like the hypothetical upstream party or real-world examples *Eastman Kodak* and *Microsoft*, Defendants have and will continue to exert market power to cut out the downstream parties and

1

**SECOND AMENDED COMPLAINT**

exploit a locked-in customer base to raise prices and monopolize the downstream market.

2.  Specifically, this case concerns payment processing and POS Systems for MLTSR restaurants.  POS Systems include computer hardware, software and services that, among many other functions, enable users to process electronic payments such as credit and debit cards.  MAS manage electronic payment information and fund exchanges between merchants and banks, payment processing networks and card issuing banks.  MAS Networks are the networks that MAS providers utilize to connect to the card brands for authorization and settlement of electronic payment transactions.  Payment Interfaces, comprised of gateways, middleware, and a combination of the two, connect POS Systems to MAS.  They provide the essential functions of encrypting and transmitting sensitive payment data, reducing the threat of and liability for data fraud and theft, and allowing merchants to manage electronic payments.

3.  Payment Interface providers establish strategic partnerships with upstream POS developers or ISVs and downstream value-added POS Dealers.  Relationships with POS Dealers are critical because they are the primary point-of-contact with the merchant and responsible for presenting POS Systems and, thus, Payment Interface choice to merchants.  While some Payment Interfaces are "neutral" and allow end-users to choose and change MAS providers with little or no cost or effort, other Payment Interfaces are "closed."

4.  Plaintiff Payment Logistics Limited ("PLL") is a family-owned, San Diego, California-based full-service payment integration technology company for ISVs, POS Dealers, and merchants, including MLTSR.  PLL's core business is providing Payment Interfaces such as its Paygistix Payment Gateway and MAS to MLTSR through integration with POS Systems such as Defendants' Restaurant Manager.  Figures 1-4 below show the products and services PLL provides to POS Systems and payment card devices, and how Payment Interfaces transmit merchant

2

**SECOND AMENDED COMPLAINT**

information for payment processing:

**Figure 1:**
**Restaurant Manager POS System Screen[1]**



---

[1] https://www.google.com/search?q=restaurant+manager+POS+System&client=firefox-b-1-ab&source=lnms&tbm=isch&sa=X&ved=0ahUKEwi6lcPe24_aAhUL2W MKHfJmCb4Q_AUICigB&biw=1500&bih=836#imgrc=52xlTL20TPByZM    (last viewed Nov. 8, 2018).

3

**SECOND AMENDED COMPLAINT**

**Figure 2:**
**Payment Card Devices[2]**



---

[2] PLL marketing materials.

**SECOND AMENDED COMPLAINT**

**Figure 3:**
**Merchant Account Services User Screen[3]**

---

[3] PLL marketing materials.

**SECOND AMENDED COMPLAINT**

**Figure 4:**
**Merchant Data Transmission Through Payment Interface[4]**



5.     Shift4 is an avaricious acquirer that is attempting to control the MLTSR payment processing "vertical" through a series of acquisitions coupled with anticompetitive conduct.  Before 2017, Defendant Lighthouse provided POS and MAS services to the MLTSR segment, described in Defendants' contemporaneous business records as ███████████████████████████████.  In 2017, in rapid order, Lighthouse acquired multiple ISVs and POS for MLTSR, including Action Systems, Inc. and its Restaurant Manager POS; Future POS, Inc. and its Future POS; and Restaurant Data Concepts, Inc and its POSitouch POS System.   These acquisitions took Defendants' share of the POS for MLTSR market from 3% to 35%. But Lighthouse still lacked a necessary component of the payment processing vertical

---

[4] PLL marketing materials.

6

**SECOND AMENDED COMPLAINT**

– a Payment Interface.

6.    Lighthouse solved this problem by acquiring Defendant Shift4 Corp. in January 2018, renaming the post-merger company Shift4 Payments (referred to herein as "Shift4").   Prior to the acquisition, Shift4 Corp. was an independent Payment Interface provider that did not have a significant presence in the MLTSR market.   Its Interface was MAS "neutral," meaning restaurants could change MAS providers without incurring monetary penalties.   As part of the merger, however, Lighthouse planned to ███████████████████████████████████ █████████████████████████████████████████████████   Within the next eight months, Shift4 negotiated two additional strategic partnerships with MLTSR ISVs – Posera (Maitre'D) and Micros, cementing its place as a major Payment Interface provider.   The following diagram illustrates the consolidation that occurred up through Defendants' acquisition of Shift4:

**Figure 5:**



7.    Armed with all facets of the payment processing vertical, Shift4 is using

_____

[5] ████████████████████   Shift4_00002 at 7.

7

**SECOND AMENDED COMPLAINT**

its post-merger market power or ███████████ to alter the competitive landscape by limiting the availability of independent Payment Interfaces like PLL and, once competition is eliminated, raising prices for MLTSR merchants. Shift4 predicts that, with its Payment Interface, POS, and MAS under the same umbrella, it will ███████ ████████████████████████████████████████████. Likewise, by eliminating Shift4's neutrality combined with merchant ████████████████ ██████████████████████ Shift4 can ███████████████████████████ ███████████████████████████ Shift4's CEO, Jared Isaacman, directed his employees to █████████████████████████████ ██████████████████████████████████████████████████ ███████████████

8.    In addition, by acquiring Shift4, Defendants are removing the ████████ ███████████ Interface, or market disruptor, which the Department of Justice and Federal Trade Commission recognize to be anticompetitive.[8]  According to the parties, the deal did not reach regulatory thresholds to trigger federal antitrust agency review.

9.    As planned, shortly after acquiring its own Payment Interface, Shift4 began a concerted effort to eliminate competition from independent Payment Interfaces and then exploit MLTSR merchants' lock-in by forcing them to both migrate to Shift4's Payment Interface and pay higher fees.

10.    Defendants' campaign includes, among other things:

- charging higher fees to MLTSR merchants for processing payments outside the Shift4 network.  Unable to afford the higher fees or to switch POS Systems, MLTSR merchants are forced to switch to Shift4; and

---

[6] ████████████████████ Shift4_00002 at 6.
[7] *Id.* at 7.
[8] *Id.* at 6; Horizontal Merger Guidelines, §2.1.5.

8

**SECOND AMENDED COMPLAINT**

- using higher fees, financial incentives, and threats to prevent POS Dealers beholden to Defendants from offering independent Payment Interfaces.

11.    Defendants' anticompetitive acquisitions have continued.  In September 2019, Defendants acquired one of the largest Payments Interfaces in the MLTSR market – Merchant Link.  Defendants are now attempting to coerce Merchant Link users to switch to Shift4's closed Payment Interface through misleading correspondence and threats of disruption in service.  By acquiring Merchant Link, Defendants have increased their market share in the Payment Interface for POS specializing in MLTSR market from 37% to 47%.  Defendants are also now able to exploit the special relationship between Merchant Link and Micros – one of the largest POS for MLTSR providers.

12.    Shift4 Payments is now the single gatekeeper controlling access to a critical mass of locked-in customers, both current and prospective.  In addition to moving restaurant-merchants to Shift4's locked-in network, Defendants are attempting to commoditize the enhanced Payment Interface features created by PLL and others, smothering innovation efforts including those intended to further increase data security and improve restaurant operations.

13.    These anticompetitive actions are unknown and undisclosed to MLTSR merchants. Defendants are forcing merchants to process payments through the Shift4 Interface, but are not disclosing that information on their POS contracts and are continuing to promote the Interface as payment processor-neutral.[9]  Existing customers, who purchased the POS before the Shift4 Corp. transaction, could not have anticipated that Defendants would be acquiring a Payment Interface or that they would be forced over to Defendants' products through higher fees and other coercive conduct.  Because of this asymmetric information, MLTSR merchants could not have

---

[9] *See* Partner With Us Save Time. Save Money. Partner With Shift4 for EMV., Shift4 Payments, LLC, https://www.shift4.com/m/insight/emv/ (last viewed Nov. 8, 2018); Shift4 Payments FAQs, Shift4 Payments, LLC, https://www.shift4.com/m/client/faq/#tippytop (last viewed Nov. 8, 2018).

9

**SECOND AMENDED COMPLAINT**

negotiated away their lock-in when purchasing Defendants' POS.

14.    Defendants' actions have and will continue to harm competition in the two relevant markets identified by Plaintiff: (i) Payment Interfaces for Defendant-owned POS for MLTSR and (ii) Payment Interfaces for POS Systems Specializing in MLTSR.   Through their campaign discussed above, Defendants are preventing independent Payment Interfaces from competing on Defendant-owned POS Systems. Independent Payment Interfaces have lost significant market share to Defendants as a result.   Plaintiff alone has lost roughly 150 accounts to Shift4 since the Shift4 merger, amounting to roughly $800,000 in recurring revenue.  This loss is attributable to Defendants' anticompetitive conduct.

15.    By preventing independent Payment Interfaces from competing on their POS Systems, Defendants are also harming competition in the market for Payment Interfaces for POS specializing in MLTSR.  Defendants' POS Systems account for roughly 35% of POS for MLTSR.  This represents an even larger percentage of the market in which independent Payment Interfaces can compete, as much of the remaining 65% of the POS for MLTSR market is closed (*i.e.*, independent Payment Interfaces cannot integrate with the POS Systems).  By foreclosing more than 1/3 of the POS for MLTSR market, Defendants are preventing independent Payment Interfaces from retaining the necessary scale to remain viable.   At least one independent Interface has been forced to leave the relevant markets by Defendants' conduct, and others are likely to follow.

16.    Ultimately, MLTSR merchants and their customers will pay the cost of the lost competition in the form of higher prices and reduced innovation and services. Pre-merger, merchants could protect themselves from Payment Interface or MAS price increases by switching to competing products compatible with the Defendant-owned POS Systems.   But Defendants aim to eliminate that choice, as their documents confirm they intend to eliminate merchants' ability to insulate from a price increase by removing competing Payment Interfaces and exploiting their lock-

10

**SECOND AMENDED COMPLAINT**

in. Without competition from rival Payment Interfaces, Defendants will be able to unilaterally raise prices for its Payment Interface services and for its MAS. Removing companies such as PLL from the market will also eliminate the competitive pressure Defendants face to innovate. MLTSR merchants will be forced to pay supracompetitive Payment Interface and MAS prices, consumers' sensitive personal information will be put at greater risk, and MLTSR merchants will not realize the benefit of innovation from a competitive Payment Interface market. Put simply, Defendants' mergers are likely to substantially lessen competition in the relevant product markets and competition is being foreclosed and monopolized.

## JURISDICTION AND VENUE

17. This action is brought under Section 15 of the Clayton Act, 15 U.S.C. §26, seeking to enjoin Defendants from violating Section 7 of the Clayton Act, 15 U.S.C. §18, Section 2 of the Sherman Act, 15 U.S.C. §2, and Section 1 of the Sherman Act, 15 U.S.C. §1, and under Section 4 of the Clayton Act, 15 U.S.C. §15.

18. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337 because this case is being brought to enforce the federal antitrust laws, presents a substantial federal question, and is protecting "trade and commerce against restraints and monopolies."

19. Defendants sell their products and services in interstate commerce, transact business in this district and/or can be found in this district, rendering them subject to the personal jurisdiction of this Court. Venue is therefore proper in this district under Section 12 of the Clayton Act, 15 U.S.C. §22, and 28 U.S.C. §1391.

## PARTIES

20. Plaintiff PLL is a family-owned Nevada limited liability company with its principal place of business in San Diego, California. PLL is an integrated payment processing solutions provider, offering Payment Interface, MAS, and other products, including to clients operating Defendant-owned POS Systems.

21. Defendant Lighthouse, formed in 2017, is a Pennsylvania limited liability

11

**SECOND AMENDED COMPLAINT**

company with its principal place of business in Allentown, Pennsylvania. Lighthouse describes itself as a leading financial organization, powering the top POS brands in the hospitality and retail sectors and offering integrated payment processing and point-of-sale solutions. Its POS System brands include Harbortouch, Restaurant Manager, Future POS and POSitouch, which its CEO calls the ███████████████ ████████ Lighthouse sells POS Systems throughout the United States, including in San Diego, California.

22. Defendant Shift4 Corp. is a Nevada corporation founded in 1994 with its principal place of business in Las Vegas, Nevada. Prior to its acquisition by Lighthouse, Shift4 Corp. offered Dollars on the Net, which it marketed as the world's largest independent or neutral payment gateway and which was and is sold throughout the United States, including in San Diego, California.

23. Shift4 Payments is a limited liability company with its principal place of business in Las Vegas, Nevada. On or about January 15, 2018, Lighthouse announced that it had acquired Shift4 Corp., and was rebranding as Defendant Shift4 Payments. Defendant Shift4 Payments is to replace the Lighthouse Network brand at the top of the organization and is powering the company's POS System, Payment Interface, and MAS offerings. It holds itself out as the leader in secure payment processing solutions in the restaurant industry, among others. The newly formed company is anticipated to process over 1 billion transactions annually for nearly 200,000 businesses, representing over $100 billion in payments each year throughout the United States, including in San Diego, California.

24. Defendant Merchant Link, LLC, founded in 1993, is a limited liability company headquartered in Silver Spring, MD. Merchant Link offers Payment Interfaces for MLTSR and hospitality merchants. The majority of its MLTSR clients used Oracle Hospitality's Micros POS System prior to the acquisition. In September 2019, Shift4 acquired Merchant Link.

25. The acts alleged to have been done by Defendants were authorized,

12

**SECOND AMENDED COMPLAINT**

ordered, or performed by their directors, officers, managers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

26. Each of the Defendants named herein acted as the agent or joint-venturer of or for the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

## TRADE AND COMMERCE

27. Defendants are engaged in "commerce," as defined by Section 1 of the Clayton Act, 15 U.S.C. §12(a). Both the Payment Interface market for Defendant-owned POS Systems for MLTSR and the Payment Interface market for POS Systems specializing in MLTSR are each a distinct "line of commerce" within the meaning of Section 7 of the Clayton Act, 15 U.S.C. §18. Defendants' transactions and conduct has and will have a substantial, direct, and reasonably foreseeable effect on interstate commerce. The goods referred to herein as being the subject of anticompetitive conduct were sold across state lines.

## PAYMENT PROCESSING INDUSTRY

28. Paying for a meal at a table-service restaurant by an electronic payment card is now commonplace. A customer offers a payment card at the conclusion of a meal. A server accepts the card, swipes or inserts it into a hardware device, and offers a receipt.

29. Processing the payment takes only seconds to complete, but in that time a series of digital communications take place. When the customer's credit or debit card is accepted at the restaurant, encrypted information is transmitted to the payment processor affiliated with the merchant, then to the bank affiliated with the credit card for authorization, then the restaurant-merchant is notified that the customer has sufficient funds or credit and the transaction is approved. Payment is then provided to the restaurant-merchant through the credit card interchange process.

30. Three components are necessary to ensure that the transaction is processed securely and efficiently: the POS System, the Payment Interface, and the

13

**SECOND AMENDED COMPLAINT**

MAS Network that MAS providers rely on to deliver their services. The Payment Interface connects the POS System to the MAS Networks that MAS providers utilize to deliver their services. The Payment Interface is a necessary piece due to recent EMV compliance rules set forth by the card brands.

**Point-of-Sale Systems**

31. The POS System includes hardware, software and support services that help manage restaurant operations. Together with the Payment Interface and the MAS, POS Systems allow restaurant-merchants to enter payment card transactions and communicate with third-party processing companies such as PLL and Shift4 Payments. POS Systems also enable management functions such as order placement, table management, management reporting on items such as staff productivity, menu item performance and a wide variety of other important operations information, inventory control and back office reporting.

**A.    POS Hardware**

32. POS System hardware components include kiosks or terminals, much like computers, that allow servers to enter a customer's food order, communicate orders with the kitchen, manage deliveries, record entry and exit times, and track inventory, among many other things. Restaurants may also have handheld terminals that allow servers to enter orders and, sometimes, process payments at the table. The hardware components must be durable to withstand heavy use by multiple employees and the unforgiving physical restaurant environment. (*See* Glossary, Figure 2 above.)

**B.    POS Software**

33. The software component provides computing capabilities for the restaurant and functionality for the hardware. For instance, the software tallies a customer's order, adds tax and other charges, and prints the total amount for the customer to remit payment. The software is also the first step in the payment processing system, where electronic payment information is entered to facilitate the exchange among Payment Processors and banks described above. POS System

14

**SECOND AMENDED COMPLAINT**

Software often must be integrated with a Payment Interface to transmit payment information to the MAS (through the MAS Networks) for processing. (*See* Figure 1, above.)

### C.   MLTSR POS Dealers

34.   MLTSR POS Dealers are the primary point-of-contact with MLTSR merchants.   They initiate the merchant relationship, sell the POS hardware and software for the initial install, and provide system and software upgrades and technological support.   POS Dealers essentially become merchants' out-sourced IT personnel and trusted business partner.   Many merchants rely exclusively on their POS Dealers for recommendations on software upgrades and payment processing solutions.   Relevant here, by selling the POS Systems, POS Dealers present merchants with Payment Interface options.   Payment Interface providers therefore rely on POS Dealers for access to customers.   In addition to revenues from merchants, POS Dealers also earn revenue through profit-sharing and other incentive programs with ISVs, Payment Interface providers, and MAS.

35.   POS Systems, their Payment Interfaces, and MAS are priced in a complex manner with multiple considerations such as initial hardware costs, ongoing license fees, repair costs, training costs, business disruption costs, costs of scaling a system post-install, and payment processing costs.   Payment processing costs are complex, defined by the different features of a transaction such as the type of payment card used and how card information is entered for transmission (*e.g.*, typed in by the merchant, typed in by the patron, or read via magnetic stripe or EMV chip). EMV compliance adds another layer of complexity.   Merchants rely on POS Dealers to communicate the costs and provide the best POS solution.   They do not have the time or resources to understand these complexities and negotiate more favorable terms (*e.g.*, prevent Interface and MAS lock-in).[10]

36.   POS Dealers typically do not discuss Payment Interface and MAS

[10] *See, e.g.*, Dkt. Nos. 25-5, 25-6, 53-29.

15

**SECOND AMENDED COMPLAINT**

options with MLTSR merchants when the POS purchase is made. Merchants' concern at that stage is the software functionality for restaurant operations like order placement, table management, management inventory systems, and other mission critical functions unrelated to payment processing. For instance, when San Diego, California-based Sadaf Restaurant No. 2, Inc. ("Sadaf") installed Restaurant Manager, it considered whether the POS had the functionality to process payments and provide data security. It did not discuss Payment Interface and MAS options. The Interface is not addressed until after the initial POS purchase is made. At that point, POS Dealers can only offer the integrated Interfaces.

### D.   POS Systems for MLTSR

37. One feature specific to MLTSR is the POS System's ability to serve as the restaurant's brain. Their POS Systems must have the ability to place orders and display in a kitchen, manage table seating and reservations, combine orders placed with bartenders and waitstaff into a single bill, perform coursing to aid kitchens in preparing orders so that multiple patrons at a particular table uniformly receive their meal courses at the appropriate time, add mandatory gratuity, track and control inventory, manage deliveries, record employee entry and exit times, measure employee productivity, assist with financial management, and, sometimes, track customer loyalty programs. These software programs must be customized to each MLTSR restaurant-merchants' needs. Systems serving quick-serve, counter-service restaurants do not have the feature set or level of customization necessary for a MLTSR.

38. The hardware, software and need for customization make the POS System an expensive and carefully calculated investment, costing $10,000 - $35,000 or more, per location for hardware and software costs alone. In addition, MLTSR spend significant time training their personnel and ensuring that the POS System properly executes patrons' orders. Training and installation costs can run upwards of $10,000, which does not include the additional costs of patrons lost due to negative

16

**SECOND AMENDED COMPLAINT**

dining experiences during the learning and integration period.  Under ordinary circumstances MLTSR rarely switch systems for at least five to seven years.  Rather, merchants are likely to upgrade the software, including the Payment Interface or MAS.

39.   ISVs develop POS Systems that specialize in specific segments of the restaurant industry.  According to Defendants' ███████████████████████████, Defendants' four wholly-owned ████████████████ Harbortouch, Restaurant Manager, FuturePos and POSitouch, cater to the █████████████████████████ ██████,[11] or restaurants with ten or fewer locations nationwide, two or more POS System terminals, and generate $50,000 or more in electronic payment volume per month per location.  This presentation explains that the ████████████████████ ████████████████████████████████ ████████████████ ███████████████████████████████████

**POS Systems with Direct-to-MAS Network**
**Connections are Not Substitutes for Payment Interfaces**

40.   POS Systems with direct connections to MAS Networks are not substitutes for Payment Interfaces.  These connections rely on antiquated, magnetic stripe technology to transmit payment.[14]  This technology is now outdated and exposes MLTSR to significant liability, as the major credit card companies have developed EMV chips that increase security and better protect against data breaches and theft.[15]

---

[11] ██████████████, Shift4_00032 at 52, 89.

[12] *Id.* at 89.

[13] *Id.* at 55.

[14] *See, e.g.,* Magnetic Strip Technology: A Dying Technology in the US, Universal SmartCards Inc. (July 31, 2017), https://www.usmartcards.com/2017/07/31/magnetic-strip-technology-a-dying-technology-in-the-us/ (last viewed Nov. 8, 2018).

[15] Large Scale Payment Data Breaches Highlight Need for U.S. Card Issuers and Retailers to Move More Quickly to Smart Chip Payment Technology, EMV Connection (Jan. 2014), http://www.emv-connection.com/smart-chip-payment-card-brief/ (last viewed Nov. 8, 2018).

**SECOND AMENDED COMPLAINT**

41.    To ensure implementation of EMV technology, on October 1, 2015, the major credit card companies adopted standards that shifted liability for fraudulent transactions to merchants if operating a non-EMV compliant payment system.[16] Since then, MLTSR have had to become EMV compliant to avoid liability, causing POS Systems with integrated Payment Interfaces that have EMV compliant MAS Network connections to become standard for MLTSR upgrading or purchasing a new POS System.[17]    Defendants recently conceded this fact, explaining to MLTSR merchants that "EMV acceptance capability . . . *has become standard since the October 2015 liability shift*."[18]

42.    Liability for fraudulent transactions for MLTSR merchants using non-EMV compliant payment systems will increase going forward.  As more and more MLTSR merchants upgrade their legacy POS Systems to add support for EMV compliant Payment Interfaces, there will be fewer MLTSR merchants susceptible to the type of fraud that EMV standards were designed to thwart.  Fraudsters will therefore target the dwindling number of MLTSR merchants without EMV compliant Payment Interfaces more often.  The only way for the holdouts to mitigate these losses is to adopt an EMV compliant payment system.

43.    MLTSR merchants do not view Direct-to-MAS Network connections as substitutes for Payment Interfaces, as they have stopped purchasing or upgrading to them since the October 2015 shift in liability.  POS Dealers do not view POS Systems with Direct-to-MAS Network connections as substitutes, as they no longer market them to MLTSR and have instructed their clients to adopt EMV compliant payment systems.  When merchants choose not to upgrade, it is standard practice for POS Dealers to have the merchant sign a waiver that holds the POS Dealer harmless for

---

[16] *Id.*

[17] *See* Understanding the U.S. EMV Liability Shifts, U.S. Payments Forum (July 2017), http://www.uspaymentsforum.org/wp-content/uploads/2017/07/EMV-Fraud-Liability-Shift-WP-FINAL-July-2017.pdf (last viewed Nov. 8, 2018).

[18] *See* Exhibit 1 ("Ex.1"), letter from Merchant Link dated September 16, 2019.

18

**SECOND AMENDED COMPLAINT**

liability to the merchant that would have been prevented with an EMV compliant system. In fact, the Retail Services Providers Association, the preeminent trade organization for POS Dealers and ISVs, provides waiver templates in their online member portal and recommends that POS Dealers use them when merchants choose not to upgrade to an EMV compliant system. The primary reason integrated POS Systems with Direct-to-MAS Network connections are still in use is because some MLTSR merchants have not upgraded or purchased a new POS System since October 2015 – not because they are substitutes for Payment Interfaces.

44. Defendants recognize that non-EMV compliant systems, like Direct-to-MAS Network connections, are not substitutes for Payment Interfaces. Shortly after acquiring Merchant Link, Defendants decided to eliminate Merchant Link's non-EMV compliant payment gateway, which will be shut down by the end of 2019. Defendants explained to Merchant Link's MLTSR clients that their Payment Interface was being shut down because it was "EXTREMELY outdated and open to hacking, breaches etc." and "does not support a number of important security features or standard technology," such as EMV compliance, point-to-point encryption, tokenization, cloud-based reporting and support tools, and Pay-at-Table acceptance capabilities. All POS Systems with Direct-to-MAS Network connections lack EMV compliance for those connections, and most share all of the security and technological issues identified by Defendants.

45. First Data Corp. (aka Fiserv, Inc.) is the largest MAS Network provider and one of the largest MAS providers in the U.S. It handles approximately 45% of all U.S. credit and debit transactions and processes an average of 2,800 transactions per second and $2.2 trillion in transactions annually. On October 30, 2019, First Data sent an alert to its clients that confirmed Shift4 was shutting down certain Merchant Link Payment Interfaces because they were not EMV compliant.[19] Specifically, First Data explained that "Shift4 has contacted Merchants across various processors

---

[19] *See* Exhibit 2 ("Ex. 2"), alert from First Data dated October 30, 2019.

**SECOND AMENDED COMPLAINT**

advising that the EMV conversion is necessary by December 31, 2019 as the non-EMV compliant platforms will be shut down," and that "[s]ince the Merchant Link buyout, Shift4 has begun an aggressive campaign to convert Fiserv's current Merchant Link clients as they are migrated to a new EMV solution by simultaneously offering their own acquirer/processing services."[20]  First Data also highlighted the deception in Shift4's correspondence, explaining that "Merchants can change platforms without changing acquirers, however, Shift4's aggressive marketing tactics and external communications have been causing confusion.  Shift4 has contacted Merchants across various processors advising that the EMV conversion is necessary by December 31, 2019 as the non-EMV compliant platforms will be shut down."[21]

46.   Merchant Link too recognized that non-EMV compliant payment systems were not viable options for MLTSR going forward.  Prior to being acquired, Merchant Link had begun notifying merchant-clients that they should move to an EMV compliant system.

47.   It is cost-prohibitive and extremely time consuming for a POS company to create a Direct-to-MAS Network connection that is EMV compliant.[22]  This is why, to Plaintiff's knowledge, it has never been done for POS Systems that cater to the MLTSR market.  For a POS company to perform a Direct-to-MAS EMV integration, it would take at least 6 months, and possibly more than a year.  The POS company seeking the EMV compliant Direct-to-MAS Network connection would need to allocate at least one skilled, full-time developer to the integration process, as well as a knowledgeable project manager.  The company would also need to purchase specially approved EMV test tools and software, which cost roughly $15,000 up front and $3,000 annually.

---

[20] *Id.*

[21] *Id.*

[22] *See* Where EMV Certification Is A Big Headache, Digital Transactions (Sept. 1, 2015), http://www.digitaltransactions.net/magazinearticles/where-emv-certification-is-a-big-headache/ (last viewed Nov. 8, 2018).

20

**SECOND AMENDED COMPLAINT**

48. After purchasing the necessary equipment, completing intake forms (which can take several weeks to complete), and configuring the test tools (which can also take multiple weeks to complete), the POS company can begin the integration process. The integration process includes at least the following steps: (i) an initial proof of concept stage, during which the company must demonstrate it can perform the integration through a series of tests; (ii) testing for each card brand, during which unique tests are run for each card type; (iii) a final test for each card type, which includes a more meticulous review of the card tests than during the second stage; and (iv) approval by each card brand, which can take a month once final tests are submitted to the card companies.

49. All-in, the EMV integration process for a Direct-to-MAS Network connection will likely cost $100,000 or more per MAS Network. At this price, it is not practical for a POS company to develop an EMV compliant Direct-to-MAS Network connection, particularly given the comparable ease and low cost of integrating an EMV compliant Payment Interface. If the POS company wants to be compatible with multiple MAS providers, it must perform a unique EMV certification for each network. It would therefore cost several hundreds of thousands of dollars and take multiple years for a POS company to create EMV compliant Direct-to-MAS Network connection that connects to all major MAS Networks.

50. The POS company would also incur significant costs to maintain EMV compliance for each MAS Network. The EMV connection requires recertification when updates are handed down from card companies and a new certification when incorporating new hardware. Both processes are laborious and costly.

51. Even large POS companies that cater to MLTSR, such as Oracle (owner of Micros POS System) and NCR (owner of Aloha POS System) have decided against developing an EMV compliant Direct-to-MAS Network connection. While these companies certainly have the capital and resources to develop a network, they have apparently determined the costs and time commitments are too great.

21

**SECOND AMENDED COMPLAINT**

52. Likewise, companies that own both a POS System for MLTSR and a MAS Network have decided against directly connecting their in-house POS Systems to their in-house MAS Network for the purpose of adding an EMV compliant payment system to their POS System, opting instead to use an EMV compliant Payment Interface. For example, Heartland Payment Systems owns both POS Systems for MLTSR and a MAS Network. Even so, Heartland uses PAX's EMV compliant Payment Interface to connect their in-house POS Systems to their in-house MAS Network.

53. Defendants and other industry participants echo these sentiments. Shift4's own promotional materials explain that "U.S. migration to EMV is typically a significant uphill climb" and "requires a major development effort and modification to basic system architecture, new programming of payment terminals, and a certification for each payment terminal/processor pair."[23] They explain that using the Shift4 Interface allows merchants to "get EMV access to every U.S. processor when you interface to us. This is far less expensive and uses a fraction of the time it would take to interface to a single processor or create a number of direct EMV interfaces."[24] PLL competitor DataCap's CEO explained that "[t]he certification process is long, deep, and ugly."[25] Heartland, which owns POS Digital Dining and Dinerware, discourages MLTSR from directly connecting to their in-house MAS Network because "full or direct integration of EMV can be daunting in terms of technical requirements as well as monetary and time investment."[26] According to

[23] One Last Payment Integration, Shift4 Corporation, https://www.shift4.com/pdf/S4-One-Last-Payment-Integration.pdf (last viewed Nov. 8, 2018).

[24] *See* Partner With Us Save Time. Save Money. Partner With Shift4 for EMV., Shift4 Payments, LLC, https://www.shift4.com/m/insight/emv/ (last viewed Nov. 8, 2018).

[25] Where EMV Certification Is A Big Headache, Digital Transactions (Sept. 1, 2015), http://www.digitaltransactions.net/magazine_articles/where-emv-certification-is-a-big-headache/ (last viewed Nov. 8, 2018).

[26] *See* EMV for Application Developers, Heartland Payment Systems, https://developer.heartlandpaymentsystems.com/DataSecurity/EMVAppDevs (last viewed Nov. 8, 2018).

22

**SECOND AMENDED COMPLAINT**

Heartland, successful EMV certification requires "both the appropriate test cards and a means of capturing, logging and validating the interaction between the terminal and chip card" called "EMV test tools."[27]  The costs for test tools is "significant," "in the range of tens of thousands of dollars."[28]  In addition, the major credit card brands "have implemented fees for their EMV certification process."[29]  Thus, EMV compliant Direct-to-MAS Network connections for MLTSR POS are cost-prohibitive and, as a result, do not exist in the marketplace.

54.    Conversely, EMV integration and certification with an EMV compliant Payment Interface takes 2 to 6 weeks and costs roughly $5,000.  It does not require a full-time dedicated effort, does not require special testing tools, and does not require any special certification from the card companies.  Instead, the Payment Interface provider deals with the Direct-to-MAS Network certification and then provides a much simpler Payment Interface for POS companies to plug into.

55.    MLTSR merchants would not switch from a Payment Interface to a POS System with a Direct-to-MAS Network connection if a hypothetical monopolist introduced a small but significant non-transitory increase in Payment Interface fees ("SSNIP").[30]  As detailed herein, it is expensive and time consuming for an MLTSR merchant to switch POS Systems.  Even if not required to switch POS Systems, MLTSR merchants would not switch to a Direct-to-MAS Network connection because they are not EMV compliant and thus expose the MLTSR merchant to significant and increasing liability for fraudulent transactions and data breaches.

56.    Multiple MLTSR merchants have confirmed they would not switch POS

---

[27] *Id*.

[28] *Id*.

[29] *Id.*

[30] A "SSNIP" is a test is used to help define product markets and represents a small but significant price increase charged by firms in the candidate market for their products.  The SSNIP test directs attention to the effects of price changes commensurate with those that might result from a loss to competition caused by the subject merger.  The Federal Trade Commission and Department of Justice typically use a SSNIP of 5%.  Horizontal Merger Guidelines, §§4.1.1 – 4.1.2.

23

**SECOND AMENDED COMPLAINT**

Systems in response to an increase in fees for Payment Interfaces. Alberto Ochoa, owner, President, and CEO of Revolucion Restaurant Corporation, explained in his sworn declaration that "[s]witching POS Systems is not an alternative" if faced with higher prices for Payment Interfaces due to "all of the associated costs, including costs for equipment, re-training wait staff, re-training administrative employees, and incurring disruptions to the restaurant and our patrons while learning and integrating the new system."[31] Likewise, Esmail Aharpour, co-owner of Sadaf Restaurant No. 2, Inc., explained in his sworn declaration that replacement of his POS System in response to an increase in fees for Payment Interfaces "is not a realistic alternative because of the significant costs associated with doing so," as well as "the significant time and effort to integrate a new system into [his] restaurant operation." Therefore, he "would be forced to pay higher prices if Shift4 Payments attempted to increase [his] payment processing costs."[32]

57. Non-integrated, standalone payment devices, whether EMV compliant or not, are not substitutes for Payment Interfaces due to, among other things, the substantial amount of manual entry and reconciliation required to operate these devices that is otherwise not required when using an integrated payment system. When using a non-integrated, standalone payment device, the staff must complete the following for each transaction: (i) enter the amount of the sale into a payment device; (ii) enter an invoice number into the device to tie that sale in the MAS provider's system to the ticket number in the MLTSR's POS system; and (iii) enter the wait staff's ID to track who ran the sale in the payment device and to whom any tip assigned to the sale should be allocated. Once the transaction is processed, the merchant must: (i) recall the transaction in the payment device and then enter a tip adjustment to capture the tip and (ii) enter the payment and the corresponding tip in

---

[31] *See* Declaration of Albert Ochoa dated May 22, 2018 ("Ochoa Dec.") (Dkt. No. 25-5).

[32] *See* Declaration of Esmail Aharpour dated May 10, 2018 (Dkt. No. 25-6).

24

**SECOND AMENDED COMPLAINT**

the POS System to alert the POS System that it was received.

58.     Then, at the end of each day or shift, the MLTSR merchant must: (i) print a detailed report, including a tip report from the standalone payment device; (ii) settle the batch in the standalone payment device (which finalizes all transactions and submits them to the MAS provider for funding); (iii) run a detailed credit card sales report in the POS System, including a tip report; and (iv) compare the POS System report to the standalone payment device's report, and reconcile any differences. Given the laborious nature of this process, virtually all MLTSR merchants use integrated payments with their POS Systems, not standalone payment devices. The level of human input required for non-integrated, standalone payment systems also increases the data transmission error, which further distinguishes non-integrated from integrated payment systems.[33]  Plaintiff estimates that less than 1% of MLTSR use non-integrated payment solutions, and that 1% represents some of the smallest MLTSR merchants.

59.     Payment Interfaces for MLTSR are distinct from Payment Interfaces for other industries, such as quick service restaurants and retailers.  Payment Interfaces for MLTSR must contend with certain issues that are not present in other markets, requiring the Payment Interface developer to incorporate solutions to these issues in the Interface.  These include: (i) tip adjustment; (ii) mandatory gratuity and additional gratuity when mandatory gratuity situations arise (common for parties of six or more), which requires the Payment Interface to add the mandatory gratuity when the initial authorization request is made and then support any additional gratuity amounts that the cardholder may add beyond the mandatory gratuity; (iii) reauthorizations or

---

[33]     *See* One Last Payment Integration, Shift4 Corporation, https://www.shift4.com/pdf/S4-One-Last-Payment-Integration.pdf (last viewed Nov. 8, 2018) (Defendants discussing the benefits of an integrated Interface). Restaurant Manager merchants have also promoted the benefits of having a fully integrated system for Defendants. *See* Restaurant Manager POS at Union Jack's British Pub (Apr. 12, 2018) *available at* https://www.youtube.com/watch?v=oQbaXYhQW0&feature=youtu.be (last viewed Nov. 8, 2018), Galway Bay Irish Pub Case Study, *available at* https://www.rmpos.com/casestudy/galway-bay-irish-pub/ (last viewed Nov. 8, 2018).

25

**SECOND AMENDED COMPLAINT**

incremental authorizations (usually for bar tabs), which protects merchants from discovering a card is declined when the patron closes his or her tab; and (iv) pay-at-the-table options where a patron is required to enter a PIN (common for foreign patrons who are traveling to the U.S.), which allows the merchant to bring the payment device to the cardholder rather than forcing the patron to walk to the POS System at a fixed location. Due to these unique features, Payment Interfaces used in other industries or segments of the food and beverage industry cannot be used by MLTSR merchants without significant modifications specific to MLTSR.

### Payment Interfaces

60. A Payment Interface is the tool required to securely collect and transfer payment transaction data between the POS System and the MAS Network. Transaction data is transferred through a third-party's Interface, such as the Interfaces offered by Shift4 and PLL.

61. Connecting a POS System directly with a MAS Network is expensive and requires sophisticated, internal technology personnel, as described above. Such direct connections are relics that were often used before EMV became the industry standard. No MLTSR POS have Direct-to-MAS Network connections available that are EMV compliant, as the only MLTSR POS Systems that allow for Direct-to-MAS Network connections use outdated technology, are not EMV compliant, and are being phased out.

62. Not only are non-EMV compliant payment systems no longer marketed to or purchased by MLTSR, but, like Europe, U.S. merchants will almost universally adopt EMV compliant systems. And, as merchants continue to move towards complete EMV certification, Direct-to-MAS connections will become obsolete. Highlighting this fact, most major credit card issuers introduced a liability shift in Europe for fraudulent transactions in the mid-2000s. From July 2018 through June 2019, 99% of card-present transactions in Europe Zone 1 (western Europe) and 94% in Europe Zone 2 involved cards and payment systems that were EMV compliant.

26

**SECOND AMENDED COMPLAINT**

The U.S. is currently following and will continue to follow a similar path. Defendants' actions prove this fact, as they are quickly shutting down the portions of Merchant Link's Payment Interface that are not EMV compliant.

63.    Most MLTSR use POS Systems that connect to a MAS Network through a Payment Interface.  The Payment Interface acts as a conduit for transaction data and can be a gateway facilitating transmission through the internet, middleware residing on the POS System operating platform or local network, or a hybrid of the two.  Payment Interfaces secure sensitive cardholder and authentication data during transmission and often store this data on behalf of merchants to reduce risk and liability.  They further mitigate risk by providing reports for reconciling transactions, assigning unique identifiers (tokens) to credit and debit card purchase information, providing data transmission back-up, monitoring and preventing inadvertent duplicate charges, and more.  Payment Interfaces became a necessary component due to the October 2015 EMV regulations described above.  They allow MLTSR to be EMV compliant cost-effectively.

64.    Payment Interfaces charge a fee for these services.  A percentage of that fee would be given to the Interface, with the remainder paid to the ISV.  The fee depended in large part on whether the Interface was "neutral" or "closed."  "Neutral" Interfaces, such as a pre-merger Shift4 Corp., charged the same Interface fee for data transmission irrespective of who the MAS provider was, and thus are payment processor agnostic.  Shift4 Corp. extolled the benefits of its neutral status, explaining that neutrality provides restaurant-merchants with the ability to choose and change MAS providers at will.  A neutral Payment Interface could be a bulwark against supracompetitive fees and price hikes, putting MLTSR merchants on an "even playing field" with MAS providers.  This was especially true with Shift4 Corp., which Defendants' ███████████████████████████████████████

███████████████████████[34] Shift4 continues to represent that its Interface is "bank

[34] ███████████████████, Shift4_00002 at 6.

**SECOND AMENDED COMPLAINT**

and processor-neutral" giving merchants "freedom to choose from nearly every major bank and processor in North America."[35]

65. MLTSR merchants do not understand how Payment Interface choice and related costs factor into POS lifecycle costs, and therefore do not factor these costs into the initial POS purchase decision. As infrequent purchasers, MLTSR merchants do not have the requisite experience to assess the quality and benefit of having multiple Payment Interfaces and/or neutral Payment Interfaces integrated with the POS. Defendants, on the other hand, have witnessed thousands of customers' experiences and know of the pro-competitive benefits of multiple and/or neutral Payment Interfaces. This asymmetric information enables Defendants to lock merchants into the POS and then raise prices to supracompetitive levels.

66. Pre-merger, Payment Interfaces competed for integration with POS Systems by offering POS Dealers and/or merchants enhanced integration and innovative services, and sometimes, discounts on the Payment Interface and transaction fees charged. Payment Interface providers would invest in developing unique, cutting-edge capabilities such as pay-at-the-table solutions or mobile self-checkout, among others. These services were attractive to ISVs and POS Dealers, who would then offer the choice of different features of each Payment Interface embedded in the POS System to MLTSR merchants. Competition between Payment Interfaces ensured that merchants would receive lower prices and innovative, superior products, including enhanced security features.

67. PLL's Paygistix Payment Gateway was an effective competitor in the Payment Interface market for MLTSR, providing customized, state-of-the-art services. PLL spent more than one year working with ASI to integrate its Payment Interface into the Restaurant Manager platform, providing services such as

---

[35] Partner With Us Save Time. Save Money. Partner With Shift4 for EMV., Shift4 Payments, LLC, https://www.shift4.com/m/insight/emv/ (last viewed Nov. 8, 2018); Shift4 Payments FAQs, Shift4 Payments, LLC,　https://www.shift4.com/m/client/faq/#tippytop (last viewed Nov. 8, 2018).

28

**SECOND AMENDED COMPLAINT**

competitive chip card processing and pay-at-the-table solutions that gave Restaurant Manager competitive advantages over other POS Systems for MLTSR.  In return, ASI elevated PLL to preferred Payment Interface status.  What resulted is a prime example of the pro-competitive relationships between an upstream party and downstream add-on supplier/resellers.  ASI enjoyed significant growth in payment processing-related income, restaurant-merchants received better and more secure integrated payment processing services at competitive prices, and, as Restaurant Manager became increasingly demanded by merchants, so did PLL's products.

68.   Pre-merger, MLTSR merchants using a Defendant-owned POS System could switch Payment Interfaces in the event of a SSNIP because Lighthouse's POS Systems offered multiple Payment Interfaces, and Payment Interface switching costs are significantly less than replacing an installed POS System.  Merchants with Defendant-owned POS Systems could request another interface option from the POS Dealer and move their Payment Interface services over to that new option at will and with little disruption to their business.

69.   But Defendants' acquisitions have changed the competitive dynamic. Their ███████████ explains that the ████████████ ████████████████████████ ████████████████████████[36] Defendants are eliminating independent Payment Interfaces, and merchants facing a price increase will have no choice but to pay higher prices.  The merger will also stifle Payment Interface innovation.

### Merchant Account Services

70.   MAS are provided by Payment Processors and facilitate information exchanges between restaurant-merchants and MAS Networks.  Payment Processors rely on MAS Networks to transmit payment card and transaction data to the card issuing banks and, ultimately, to enable funds to be deposited into the restaurant-

---

[36] ███████████, Shift4_00002 at 6.

**SECOND AMENDED COMPLAINT**

merchant's bank account (*see* Figure 3, above).  MAS providers also ensure accurate reporting, aid in the recovery of transactions, and manage risks associated with processing electronic payments.

71.   MAS are where payment processing companies such as Shift4 Payments earn the most revenue.  MAS typically charge a fee per transaction to process electronic payments, such as between 1.5% – 4% of each patron's total bill.  The revenue stream is perpetual, continuing as long as the restaurant-merchant accepts electronic payment and increasing as a restaurant increases its volume.

72.   As alleged above, Lighthouse had no proprietary Payment Interface to direct revenues to its MAS prior to acquiring Shift4 Corp.  Post-merger, Defendants have tied their Payment Interface and MAS products to their POS System in a scheme to force merchants away from independent Payment Interfaces and MAS providers and to their own MAS.  As discussed herein, POS Systems are expensive and time consuming to replace and are mission-critical for MLTSR merchants.  Merchants are therefore locked-in to their POS System.  Defendants are leveraging merchants' lock-in to gain an anticompetitive advantage in the markets for Payment Interfaces and MAS.  MLTSR merchants using Defendants' POS have no choice but to accept this tie and price increases associated with this tie.  Consequently, Defendants can and plan to charge supracompetitive prices for Payment Interfaces and MAS because restaurant-merchants will be locked into its network.

## RELEVANT PRODUCT MARKETS

### Payment Interfaces for Defendant-Owned POS Systems for MLTSR

73.   As alleged above, MLTSR require POS Systems that are customizable and serve as its hub of operations.  MLTSR typically have 10 or fewer locations nationwide, two or more POS System terminals, and generate $50,000 or more in electronic payment volume per month per location.  For these restaurants, the POS System represents a significant investment of time and money and is rarely switched once installed.  In selecting the Payment Interface, restaurant-merchants are limited

30

**SECOND AMENDED COMPLAINT**

to only those with established connections with its POS System. Because merchants cannot readily switch POS Systems given their significant cost, Defendants can ██████████████████████████████████████████████████ ████████████████ .[37]

74.    ISVs dictate which Payment Interfaces are capable of integration with their POS System Software. API access and POS System-specific functions and features must be negotiated and agreed upon. Payment Interfaces embedded in one POS System, but that do not connect with another POS System, are not interchangeable. For example, Payment Interfaces embedded into Restaurant Manager, but not POSitouch, are not substitutes. The same is true for Payment Interfaces embedded in Future POS, POSitouch and Harbortouch. Once an MLTSR installs a Defendant-owned POS System, it is ████████ and limited to only those Payment Interfaces already embedded or can quickly become embedded into their respective software. Merchants' information deficit prevents them from negotiating away their lock-in at the outset. For these reasons, a restaurant-merchant with a Defendant-owned POS System would not switch to a Payment Interface embedded into another POS System if faced with a SSNIP. Therefore, a hypothetical monopolist in the Payment Interface market for Defendant-owned POS Systems for MLTSR would find it profitable to impose a SSNIP, making this a distinct relevant product market. Although Payment Interfaces integrating with each Restaurant Manager, Future POS, POSitouch and Harbortouch could serve as individual product markets, it is appropriate to consider the acquisitions' effect across this entire cluster of Payment Interfaces because Payment Interfaces integrating with this group of POS Systems face similar competitive conditions.

**Payment Interfaces for POS Systems Specializing in MLTSR**

[37] ███████████████████████████████████████████████████████ Shift4_00572 at 574; ███████████████ ████████ Shift4_00579 at 580.

31

**SECOND AMENDED COMPLAINT**

75. Payment Interfaces for MLTSR POS Systems also constitute a distinct product market. Due to the necessary level of customization and outside technological support, ISVs develop POS Systems specifically for MLTSR, and those systems require MLTSR-compatible Payment Interfaces. Payment Interfaces designed for other segments of the restaurant industry do not have the connections and integration necessary to service the MLTSR market and therefore are not viable substitutes. Direct connections to MAS Networks either use obsolete technology and cannot protect against data theft liability or are too costly to become EMV compliant. Non-integrated (or standalone) payment systems lack the functionality MLTSR merchants need and are too costly and time-consuming for MLTSR. These are also not viable alternatives. A hypothetical monopolist in the market for Payment Interfaces for POS Systems specializing in MLTSR would find it profitable to impose a SSNIP, making this a distinct relevant product market. As with the narrower Payment Interface for Defendant-owned POS product market, it is appropriate to consider the acquisitions' effect across this entire cluster of Payment Interfaces as well because the underlying competitive dynamics that determine the likelihood that competition will be adversely impacted apply to all POS Systems for MLTSR.

## RELEVANT GEOGRAPHIC MARKET

76. The United States is the relevant geographic market for Payment Interfaces for Defendant-owned POS Systems and Payment Interfaces for POS Systems specializing in MLTSR.

## DEFENDANTS' ACQUISITIONS ARE ANTICOMPETITIVE

77. Prior to 2014, competition in the relevant product markets was vibrant. MLTSR merchants had several options for POS Systems, including Aloha POS (owned by NCR), Micros (owned by Oracle), Digital Dining, Dinerware, Harbortouch, Restaurant Manager, POSitouch, Future POS, Focus POS and Maitre'D. Many of the POS Systems offered multiple Payment Interfaces, allowing restaurant-merchants choices for Payment Interface and MAS.

32

**SECOND AMENDED COMPLAINT**

78. Competition was further enhanced because several Payment Interfaces, including Shift4 Corp.'s, were "neutral" and further enhanced merchant choice, in contrast to closed Payment Interfaces. As a result, merchants could switch to alternative Payment Interfaces (and potentially MAS) while maintaining full functionality of the POS System if faced with a SSNIP.

79. Then, the MLTSR POS System market underwent significant consolidation. Acquisitions by Payment Processors increased the number of closed POS System-Payment Interface-MAS networks. In 2014 and 2015, payment processor Heartland[38] acquired Digital Dining and Dinerware. These POS Systems became essentially unavailable for independent Payment Interface providers such as PLL.

80. In August 2017, Lighthouse acquired ASI and its Restaurant Manager POS System. It then contrived to eliminate competition in Payment Interfaces by restricting POS Dealers' promotion of non-Lighthouse-affiliated Payment Interfaces, such as PLL.

81. In the Fall of 2017, Lighthouse acquired two additional POS Systems serving MLTSR: Restaurant Data Concepts, Inc. and its POSitouch POS System, and Future POS, Inc. and its Future POS System. These acquisitions significantly increased Lighthouse's market share, to approximately 35% of the POS for MLTSR market. According to Defendants' ███████████, those three acquisitions allow it to ████████████████████████████████████ ████████████████████████████████████ ████████████████████[39] For comparison, pre-August 2017 and with Harbortouch as its sole POS System, Lighthouse's market share was around 3%. The firms comprising the remaining 65% of the POS for MLTSR market include increasingly few firms that allow for independent Payment Interface integration.

[38] Heartland was subsequently acquired by Global Payments, Inc.
[39] ██████████████, Shift4_00002 at 6.

33

**SECOND AMENDED COMPLAINT**

And Defendants' POS market share has only grown since first initiating this action. In the Summer of 2018, Defendants announced partnerships with Posera and, separately, with Micros.[40] These quasi-mergers eliminate any potential competition between them and Defendants.

82. Then, in January 2018, Lighthouse announced it would acquire Shift4 Corp., which provided the structural change necessary to negatively affect competition. Lighthouse CEO Jared Isaacman called the transaction a ███████████████████████████████████[41] According to Defendants' ███████████, Defendants intended to ████████████ ████████████ by acquiring Shift4 Corp., and also put themselves ███████ ████████████████████████████████████████████████████ ████████████████████████ CEO Isaacman directed employees to █ ████████████████████████████████████████████████████ ████████████████████████[43] The ███████ ███████ expressly contemplated merchant ████████████████ ████████████████████████████[44] CEO Isaacman told his company that ████████████████████████ ████████████[45] His professed ████████████████████

<hr>

[40] *See* Shift4 Payments and Posera Announce Merchant Services Solution for Restaurants, Shift4 Payments, LLC, (June 21, 2018), https://www.shift4.com/m/company/newsroom/press.cfm?article=pr-s4-posera-msp-restaurants.cfm (last viewed Nov. 8, 2018); We've Redefined What an Integrated Solution Can Be, Shift4 Corporation, https://www.shift4.com/pdf/Shift4-Oracle-Co-Brand-Slick.pdf (last viewed Nov. 8, 2018).

[41] ████████████████████████ Shift4_000500 at 501.

[42] ████████████, Shift4_0002 at 6, 7, 22, 25; ████████████████ Shift4_00500 at 501, 503.

[43] ████████████████████ Shift4_00572 at 574; ████████████ Shift4_00579 at 580.

[44] ████████, Shift4_00002 at 7.

[45] ████████████████████████

**SECOND AMENDED COMPLAINT**

[REDACTED] 46

83. The following diagram demonstrates the significant consolidation and ultimate foreclosure caused by Defendants' acquisitions through the Shift4 merger:



84. Continuing its series of avaricious acquisitions and attempt to control the MLTSR payment processing vertical, in September 2019, Shift4 acquired Merchant Link. Merchant Link provides Payment Interfaces that connect MLTSR to MAS providers. Pre-merger, Merchant Link's Payment Interfaces operated in a neutral



Shift4_00540 at 541-542.

Shift4_00572 at 574;

Shift4_00579 at 580.

Shift4_00395-397

Shift4_000547 at 548-550

Shift4_000556 at 558-560

35

**SECOND AMENDED COMPLAINT**

manner (except when targeting enterprise merchants).

85. Merchant Link has developed a special relationship with Micros – the largest of the POS for MLTSR providers that permit reasonable competition from independent Payment Interfaces. Most Merchant Link customers use Micros POS and this customer base represents the majority of Micros's MLTSR users. Defendants now own this customer base and can exploit this special relationship to limit independent Payment Interfaces' access to Micros POS System MLTSR merchants.

86. By acquiring Merchant Link in a horizontal merger, Defendants have removed an independent Payment Interface competitor and established an even-more-dominant player with a market share of 47% in the market for Payment Interfaces for POS specializing in MLTSR. The effect of this combination may be to substantially lessen competition and/or tend to create a monopoly in this line of commerce. Pre-merger Defendants controlled roughly 37% of the Payment Interface for POS specializing in MLTSR market and Merchant Link controlled roughly 10% of this same market.

87. Following the merger, Defendants decided to eliminate Merchant Link's non-EMV compliant Payment Interfaces and are aggressively converting Merchant Link users to Shift4. According to correspondence from Defendants, the Merchant Link users' "PAYMENT PLATFORM WILL SHUT DOWN BY DECEMBER 21, 2019" and they must "TAKE ACTION NOW TO AVOID DISRUPTION OF THEIR SERVICE!"[47] (emphasis in original). Defendants explained that the Merchant Link Payment Interface was "going away/closing down" due to "[s]ecurity," the Payment Interface was "EXTREMELY outdated and open to hacking, breaches etc.," and "does not support a number of important security features and other standard technologies." First listed among the lacking security features was that the Payment Interface had "[n]o EMV acceptance capability, which has become standard since

[47] *See* Ex. 1

**SECOND AMENDED COMPLAINT**

the October 2015 liability shift."[48]

88.    In their correspondence to Merchant Link customers, Defendants omitted that the customers could select non-Shift4 Payment Interfaces and/or MAS that were integrated on Micros's POS System.  Rather than disclose this fact, Defendants implied the merchants' only option to avoid disruption of service was to convert to Shift4 Payment Interfaces.  Specifically, Shift4 told merchants that "[a]lthough our current platform will be shutting down, we are pleased to announce that all transactions will be seamlessly migrating to a superior new platform provided by Shift4 Payments.  You will not experience any disruption to your service during this migration as long as you take action now."[49]  First Data recognized Defendants' ploy, explaining to its thousands of clients that merchants could actually change to non-Defendant Payment Interfaces, explaining that "Shift4's aggressive marketing tactics and external communications have been causing confusion."[50]

89.    Defendants are trying to bully the majority of Merchant Link MLTSR merchants into signing contracts and switching to Shift4's Payment Interface (and thus MAS) by forcing them to switch Payment Interfaces now or risk disruption during their busy holiday season.  Defendants are omitting the fact these merchants are not required to switch to Shift4, and these merchants lack the time and wherewithal to research and secure an alternative Payment Interface.  Through these actions, Defendants are preventing independent Payment Interfaces from competing for these MLTSR merchants.

**Defendants are Limiting Competition Through**
**Higher Fees for Independent Payment Interfaces**

90.    Defendants' ███████████████████████ following their acquisitions is to ██████████████████████████████████████████████

---

[48] *Id.*
[49] *Id.*
[50] *See* Ex. 2

**SECOND AMENDED COMPLAINT**

[51] ██████████████ To accomplish their goal, Defendants intend to ██████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████ [52] To limit competition on their POS Systems, Defendants are charging higher fees for MLTSR merchants processing payments outside of Shift4 (*i.e.*, using an independent Payment Interface). Due to these higher fees, MLTSR merchants have no choice but to switch to Shift4 because they cannot afford to pay higher Payment Interface fees and cannot afford to purchase a new POS System.

91. Defendants' purchase order forms, effective February 1, 2018, call for Payment Interface fees of $25 per month plus $0.03 per transaction for merchants processing payments outside of Shift4. These fees are almost double pre-merger prices. POS Dealers report that these same merchants are also being charged at least $700 (up from $500) per Restaurant Manager software license if not processing payments through Shift4's network. Conversely, Merchants processing payments through Shift4 are not charged these transaction or licensing fees.

92. The higher fees are forcing MLTSR merchants to switch to Shift4, many

---



[51] ████████████████████████████████████ Shift4_00572 at 574; ██████████
████████ Shift4_00579 at 580. ████████████████████████
Shift4_00395-397 ███████████████████████████████
█████████████ Shift4_000547 at 548-550 ████████████
███████ Shift4_000556 at 558-560 ███
[52] ███████████ Shift4_00002 at 6; ████████████████████████
████████████████████████████████████ Shift4_00500
███████████████████████ Shift4_00572 at 574; ██████
████████████ Shift4_00579 at 580.

**SECOND AMENDED COMPLAINT**

of whom would not have done so but-for the fee increases.  For example, Mr. Ochoa of Revolucion explained that, despite PLL's "exceptional customer service and competitive payment interface and merchant account service fees," he "would have no choice but to switch to Shift4" if faced with an increase in fees because "Revolucion has very small profit margins, and I cannot afford to cut into those margins by paying higher payment processing fees to stay with PLL."[53]   And independent Payment Interface providers cannot internally absorb the additional fees and remain a cost-competitive alternative.

93.   Plaintiff's expert, John Scalf, reached a similar conclusion, finding that "Defendants' documents show that they planned to limit consumer choices in the market for Interfaces for Defendant-owned POS after acquiring Shift4 Corp."[54]  Mr. Scalf further concluded:

> As I noted in Scalf 1, this forced migration of its POS customers to its Interface and MAS is what Shift4 Payments implemented following the acquisition of Shift4 Corp.'s technology by beginning to charge an additional toll to its POS customers for using an independent Interface or MAS.  As I also noted in Scalf 1, in the absence of this toll, the price that Shift4 Payments could charge its POS merchants for Interfaces or MAS would be limited by the competitive offerings by independent Interface developers lik                                     ents is able to be                                           not because of the                                          POS customers were simply denied the choice of independent Interfaces at competitive prices.

94.   PLL and other independent Payment Interfaces have lost substantial business to Shift4 due to these discriminatory fees.  Since Lighthouse acquired Shift4 Corp., Plaintiff alone has lost roughly 150 MLTSR accounts to Shift4 totaling about $800,000 in annual net recurring revenue (after subtracting pass through fees from the card brands and processor costs). And Defendants' tactics are becoming more effective, as Plaintiff is losing MLTSR accounts to Shift4 at a greater rate as time

---

[53] *See* Ochoa Dec.

[54] *See* Supplemental Declaration of John Scalf dated October 19, 2018 (Dkt. No. 53-17).

**SECOND AMENDED COMPLAINT**

goes by.

95.    PLL is aware of at least two additional independent Payment Interfaces that have also lost a substantial number of customers and revenue to Shift4 as a result of Defendants' fees and other actions to limit competition from rival Payment Interfaces on their POS Systems.  One of these Payment Interface providers has exited the Payment Interface for MLTSR market as a result, further decreasing competition for Payment Interfaces in the MLTSR market.

### Defendants are Forcing POS Dealers to Switch Clients to Shift4

96.    Again, POS Dealers are the primary point-of-contact with MLTSR merchants and present the merchants with Payment Interface options.  MLTSR merchants' concern when purchasing a POS System is its functionality for restaurant operations – not the Payment Interfaces used by the POS Systems.  Payment Interface companies therefore must rely on POS Dealers to access customers.

97.    Shift4 understood this dynamic and sought to eliminate independent Payment Interfaces by forcing POS Dealers to send merchants to Shift4.  In 2017, Defendants employed a ▆▆▆▆▆▆▆▆▆▆▆ campaign.  CEO Isaacman's ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆[55]  He ordered employees to ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆[56]  One POS Dealer reported that they are being offered significant financial incentives, such as signing bonuses, waived fees, upcharges and higher monthly payments.  Another reported that a Shift4 Payments executive threatened to allow another POS Dealer to encroach on his sales territory and poach



[55] ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ Shift4_00002 at 6.

[56] ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ Shift4_00540 at 541-542; ▆▆▆▆▆▆▆▆▆▆▆ Shift4_00572 at 574-575.

40

**SECOND AMENDED COMPLAINT**

customers if he did not convert MLTSR merchants to Shift4's Payment Interface and MAS.

98.    By charging higher fees for independent Payment Interfaces, Defendants are preventing POS Dealers from offering independent Payment Interfaces for customers using Defendants' POS Systems.  POS Dealers with customers using independent Payment Interfaces on a Defendant-owned POS System are forced to either absorb or pass through Defendants' higher fees for processing payments outside of Shift4.  POS Dealers cannot afford to absorb Defendants' higher fees and have lost business when attempting to pass through these costs to existing customers. Existing customers using independent Payment Interfaces do not understand why they are now being charged higher fees for the same products, leading to deteriorating relationships with POS Dealers.  Consequently, as a POS Dealer explained, they can no longer afford to send merchants to independent Payment Interfaces and will ultimately have to switch all clients to Shift4.

99.    In addition to Defendants' fee structure, POS Dealers are reporting that, since May 1, 2018, all merchants (new and existing) that install a Defendant-owned POS System are required to use Shift4's Payment Interface, regardless of the merchants' current payment processor.  POS Dealers are therefore forced to install Defendants' Payment Interfaces for Defendants' POS Systems.  They cannot provide unbiased opinions on the benefits of independent Payment Interfaces and are unable to offer software discounts when an independent Payment Interface is used.

100. POS Dealers are beholden to Defendants given that Shift4 now controls roughly 35% of the POS for MLTSR market.  POS Dealers cannot afford to lose Shift4's business and be foreclosed from more than 1/3 of the market, and therefore must comply with Shift4's directives.  As one POS Dealer reported, even when they do not want to sell Defendants' POS System due to concerns about product quality and/or future fee increases for merchants, POS Dealers must do so to remain in business.

**SECOND AMENDED COMPLAINT**

101. Defendants are also offering POS Dealers monetary incentives to ensure POS Dealers abide by Defendants' directives.  According to Shift4's February 1, 2018 purchase order forms, POS Dealers may waive all Interface and licensing fees and offer reduced POS hardware costs to merchants who switch to Defendants' network.  But, the waived Interface and software fees "can be marked up and 100% of the fee over cost is given to the reseller.  The reseller can also charge a setup fee that is paid 100% to the dealer."[57]  One merchant was told by its POS Dealer that PLL was no longer an option for processing, and that merchant switched to Defendants' Payment Interface.  Industry sources have also indicated they believe Defendants will completely write out independent Payment Interfaces from future POS System upgrades or software versions, eliminating all remaining competition from independent Payment Interfaces on Defendants' POS Systems.

## ANTITRUST INJURY

102. Due to their acquisitions and other anticompetitive conduct, Defendants now control roughly 35% of the POS for MLTSR market, even when accounting for cloud-based POS Systems.  And through their acquisition of Merchant Link, Defendants increased their market share in Payment Interfaces for POS specializing in MLTSR from roughly 37% to 47%. Defendants also now have a special relationship with Micros, which they can exploit to limit independent Payment Interfaces' access to Micros's POS – the largest POS for MLTSR on which independent Payment Interfaces can compete.

103. Defendants have also engaged in a concerted campaign to prevent independent Payment Interfaces from competing on Defendants' POS Systems. This scheme has been successful, as rival Payment Interfaces have lost a substantial number of clients to Shift4 since its inception.  Plaintiff alone has lost 150 MLTSR accounts to Shift4 totaling about $800,000 in annual net recurring revenue. This

---

[57] Shift4 Gateway is available for new merchants!!!, Restaurant Manager Admin & Operations.  *See* Dkt. No. 25-12.

42

**SECOND AMENDED COMPLAINT**

attrition will likely continue or intensify, especially if, as industry sources predict, Defendants implement more severe competitive restraints like writing independent Payment Interfaces out of future versions of their POS Systems altogether.

104. By preventing competition on their POS Systems, Defendants are foreclosing independent Payment Interfaces from roughly 35% of the broader market for Payment Interfaces for POS Systems specializing in MLTSR.  In doing so, Defendants are depriving independent Payment Interfaces of the necessary scale to continue to operate in the relevant markets.  There are now only three non-hostile, neutral POS Systems on which independent Payment Interfaces can compete: Maitre' D, Micros, and Focus POS.  But Defendants now own the Payment Interface customer relationships for the majority of MLTSR merchants using Micros POS. And Maitre'D, Focus POS, and Micros combined only control roughly 17% of the POS for MLTSR market.  Shift4 has also added integrations to each of these POS Systems.

105. Based on pre-merger prices and margins, and current trends in revenues and client account losses, PLL will be unable to maintain its minimum viable scale and remain in the market for Payment Interfaces for POS specializing in MLTSR. PLL is aware of at least two rival Payment Interface companies experiencing similar issues.  And other independent Payment Interfaces likely have similar fixed costs and unit margins; are likely facing similar decreases in sales and revenues; and are likely unable to maintain sufficient scale to remain in the market for Payment Interfaces for POS Systems specializing in MLTSR.  Due to Defendants' actions, Payment Interfaces are also less able to raise new capital to expand lines of business and are experiencing employee loss.

106. Defendants' acquisition of Merchant Link exacerbates this problem, as it forecloses independent Payment Interfaces from competing for an additional segment of MLTSR merchants.  Pre-merger, Merchant Link was a significant player in the Payment Interface for POS Systems for MLTSR market and functioned as a neutral

**SECOND AMENDED COMPLAINT**

Payment Interface (except when targeting enterprise merchants). Most of its clients used a Micros POS System, and this client base represented a significant portion of Micros's POS for MLTSR. Micros does not own a Payment Interface and thus permits integration from independent Payment Interfaces. However, following the merger, Shift4 is eliminating Merchant Link payment gateways and coercing its users through scare-tactics and half-truths to switch to Shift4's closed system. Defendants now also possess the contact information for all Merchant Link clients. Shift4 can use this information to directly and continuously target any Merchant Link clients that do not switch to Shift4 immediately. Once imbedded on Defendants' closed system, independent Payment Interfaces and MAS providers will be foreclosed from competing for these MLTSR merchants.

107. Competition among Payment Interfaces leads to lower prices and a higher quality Payment Interface for MLTSR merchants. Merchants are willing to switch Payment Interfaces integrated on their existing POS to take advantage of cost savings given the relative ease and lack of expense associated with this process, forcing Payment Interfaces to compete by lowering prices. As Mr. Ochoa of Revolucion explained:

> [W]e have switched payment processors at least four times in order to pay lower fees. We switched to PLL as our payment interface and merchant account services provider approximately four years ago for these very reasons. We have stayed with PLL as our payment processor because of its exceptional customer service and competitive payment interface and merchant account services fees. PLL has worked to reduce our fees on several occasions.[58]

108. Defendants eliminated a low cost "maverick" when acquiring Shift4. Pre-merger, Shift4 provided a low-cost option for MLTSR merchants. Its Payment Interface controlled less than 10% of the market and was ██████████████ ██████████████"[59] Thus, Shift4 could have independently increased its MLTSR market presence by offering merchants lower prices. The Department of Justice and

---

[58] *See* Ochoa Dec.
[59] ██████████████ Shift4_00002 at 6.

44

**SECOND AMENDED COMPLAINT**

Federal Trade Commission call such disruptive firms "mavericks." [60]   And Defendants' elimination of Shift4 as a low-cost provider is viewed as evidence of a merger's anticompetitive harm.[61]

109.   Rather than continue to offer Shift4 as a low cost option, Defendants plan to first ██████████████████████████████████ ████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████ [64]   According to CEO Isaacman, ███████████████████████████████████████ ████████████████████████████████ ████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████ [66]   Put simply, Defendants plan to eliminate Payment Interface choice for MLTSR merchants using their POS, force the merchants to use Shift4's network, and then charge the merchants higher prices.  Merchants are ████████████ ████████ Shift4's POS and are therefore unable to protect themselves from Defendants' price increases.

110.  With the elimination of independent Payment Interfaces from its POS Systems, Shift4 will have monopoly power and become the ██████████████ ████████ [67]   The only remaining option for MLTSR merchants wanting to switch

[60] Horizontal Merger Guidelines, §2.1.5.
[61] *Id.*
[62] ████████████████████ Shift4_00002 at 6, 7, 22, 25; ████████████████████ ██████ Shift4_00572 at 574; ████████████████████ ████████████████████ Shift4_00579 at 580.
[63] ████████████████████████████████ Shift4_00092 at
[64] ████████████████████ Shift4_00002 at 7.
[65] *Id.* at 7.
[66] *Id.* at 25.
[67] *Id.* at 6.

45
**SECOND AMENDED COMPLAINT**

Payment Interfaces or MAS in the face of a price increase would be to install a different POS System, which, as stated above, is cost-prohibitive and requires substantial manpower.  Defendants will be able to increase prices for all merchants by at least their predicted $0.03 per round trip transaction, if not up to the cost for restaurant-merchants to switch POS Systems.  Defendants may also be able to increase MAS prices up to the cost of switching POS Systems.

111. As discussed herein, Defendants are forcing independent Payment Interfaces to not only exit the Payment Interface for their POS, but also forcing them to exit the market for Payment Interfaces for POS specializing in MLTSR market.  By doing so, Defendants are significantly reducing the number of rival Payment Interfaces competing for integration on the few remaining open third-party POS Systems like Maitre'D and Focus POS.  This reduction in competition will lead to increased prices and a greater risk of price coordination among the small number of remaining Interfaces, potentially allowing them to charge supracompetitive prices.

112. Innovation will also suffer if independent Payment Interfaces are eliminated.  Without a flow of customers from an in-house POS System, independent Payment Interfaces must distinguish themselves through innovation.  For example, PLL strategically differentiated itself as a Payment Interface provider by developing cutting-edge products, including those that increase data security and operational efficiencies.  If PLL and others are removed from the market, Shift4 will have no incentive to continue to develop enhanced Payment Interface offerings, including payment security features even as technology – and the ability to compromise data – advances.  Consumers' data will therefore be increasingly at risk. PLL requested post-merger conduct changes to mitigate these effects but Defendants refused.

113. In sum, Defendants have harmed competition in at least the following ways:

- Foreclosing competition from independent Payment Interfaces for Defendants' POS by, *inter alia*: (i) forcing MLTSR merchants to switch to Shift4's Payment Interface and MAS by charging them higher fees for

46

**SECOND AMENDED COMPLAINT**

processing payments outside of the Shift4 network, and (ii) pressuring POS Dealers beholden to Shift4 to switch their clients to Shift4's Payment Interface and MAS through fees, financial incentives, and threats;

- Significantly reducing competition from independent Payment Interfaces in the market for POS specializing in MLTSR by limiting the pool of MLTSR merchants through their acquisition of Merchant Link and effectively shutting out more than 1/3 of this market to independent Payment Interfaces, preventing them from reaching the necessary scale to remain viable;

- Eliminating a low-cost "maverick" Payment Interface by acquiring Shift4 and using it to perpetuate a scheme to lock-in MLTSR merchants to Defendants' Payment Processing vertical and then increase prices; and

- Tying their Payment Interface and MAS products to their POS System to again force MLTSR merchants away from independent Payment Interfaces and MAS providers and to their own, foreclosing a substantial amount of commerce as a result.

114. As these facts demonstrate, Defendants have significantly reduced or eliminated competition in the relevant markets.  The result will be more expensive and lower quality Payment Interfaces for MLTSR merchants.  And due to their lock-in, MLTSR merchants will have no option but to pay the higher prices.

115. The prospective harm to competition described above is highly plausible based on Defendants' contemporaneous business records confirming the scheme described above.  It is also already occurring in other markets, such as the market for Payment Interfaces serving major lodging establishments in the United States.  Pre-merger, Shift4 made significant headway into the market by promoting its Payment Interface's neutrality status to Property Management Systems ("PMS"), gaining a market share in excess of 50% and locking-in their customer base.  Post-merger, with PMS, Payment Interfaces, and MAS under one umbrella, Defendants have begun exploiting their lock-in market power by offering revenue-sharing incentives to ISVs and PMS Dealers and Payment Interface discounts to drive business to the Shift4

47

**SECOND AMENDED COMPLAINT**

Payments conglomerate. They have removed ISVs' and PMS Dealers' incentives to encourage Payment Interface options and dealers, disabling Payment Interface competitors. Once competition is eliminated and Payment Interface accounts locked into the Shift4 network, Defendants will have the ability to recoup revenue-sharing costs by raising prices on MAS. And this outcome became even more likely when Shift4 acquired Merchant Link, which also provided Payment Interfaces for this market. Following the acquisition, Defendants control an overwhelming majority of Payment Interface for major lodging establishments.

116. Another industry impacted is motorcycle and accessory sellers, which use a Dealer Management System ("DMS"), like a POS or PMS. The DMS is also an expensive investment and merchants are locked-in upon purchase. According to DMS merchant The Ranch Harley Davidson, pre-merger, its only Interface option was Shift4 Corp. but, because Shift4 Corp. was neutral, it processed payments through the MAS of its choosing. The Ranch Harley Davidson found alternatives, such as Heartland, to be low-cost providers. After the merger, Defendants increased merchants' prices to use Heartland significantly. The Ranch Harley Davidson was forced to switch over to the Shift4 network against their will; it firmly believes costs will increase in the near future. Merchants are trapped and will be forced to pay higher transaction fees, much like MLTSR merchants will be. Defendants' conduct must be stopped in its tracks.

117. As a direct, proximate, and foreseeable result of Defendants' acquisitions and other anticompetitive conduct alleged herein, Plaintiff has been and will continue to be increasingly injured in its business and property. Plaintiff is being excluded from the relevant markets and has no adequate remedy at law.

## NEW ENTRY IS UNLIKELY

118. It is difficult for new firms to enter the market for Payment Interfaces for Defendant-owned POS Systems for MLTSR.

119. Integration with POS Systems is time consuming and technically

48

**SECOND AMENDED COMPLAINT**

difficult, particularly considering EMV compliance, which is now industry standard. The Payment Interface must develop a relationship with the ISV, get access to API, and be allowed to create and embed its Payment Interface into the POS System. Then the Payment Interface must expend considerable time and specialized knowledge to code the Payment Interface to fit and enhance the POS System's existing features and functionality. Access to APIs must be negotiated and agreed upon. Negotiating EMV compliance can take several months. Developers need assurances that POS Dealers will market their products to end-users. It took over one year for PLL to customize its Payment Interface to support the needs of MLTSR merchants that Restaurant Manager caters to and required significant resources and proprietary knowledge to support the MLTSR features found in Restaurant Manager in PLL's Payment Interface.

120. Payment Interfaces are also unlikely to enter the relevant markets without a prior commitment from Defendants that integration will not only be allowed, but also promoted. Because of Shift4 Payments' new policy to ████████████ ████████████████████████ ████████████ ████████████████████████████████████████ the company likely will not grant access to new entrants or nascent Payment Interface competitors.

121. For these same reasons, Payment Interfaces are unlikely to enter the market of POS Systems for MLTSR. It is equally costly and time consuming to integrate with the remaining POS Systems serving MLTSR, and access and integration must similarly be negotiated and agreed upon. Entry into the market of Payment Interfaces for POS Systems specializing in MLTSR is unlikely.



68 ████████████████████, Shift4_00572 at 574; ██████ ████ Shift4_00579 at 580; ██████████████████████ Shift4_00395-397.

**SECOND AMENDED COMPLAINT**

## FIRST CLAIM FOR RELIEF

### Clayton Act, Section 7, 15 U.S.C. §18
### (Against Defendants Lighthouse, Shift4 Corp., and Shift4 Payments)

122.  PLL hereby incorporates by reference paragraphs 1-121 above, as though alleged fully herein.

123.  The transaction between Lighthouse and Shift4 Corp. is likely to substantially lessen competition in the relevant product markets in violation of Section 7 of the Clayton Act, 15 U.S.C. §18.

124.  For reasons described above, the relevant product markets include at least Payment Interfaces for Defendant-owned POS Systems for MLTSR, requiring integration, connection, and access to the Restaurant Manager, Future POS, POSitouch, and Harbortouch POS Systems, and Payment Interfaces for POS Systems specializing in MLTSR.   The relevant geographic market for these Payment Interfaces is the United States.

125.  Foreclosure is likely to occur in the market of Payment Interfaces for Defendant-owned POS Systems for MLTSR and Payment Interfaces for POS Systems specializing in MLTSR in the manner described above.   If merged, Defendants will acquire sufficient market power to force competitors such as PLL to exit the Payment Interface market for MLTSR, thereby reducing customer choice and ultimately enabling Defendants to charge merchants supracompetitive prices.

126.  Barriers to entry are high, and new entry is neither likely, timely, or sufficient to replace the competition lost as a result of the acquisition.

127.  The transaction is likely to harm competition as well as consumers.

128.  The transaction is likely to force PLL to exit the relevant product markets, thereby directly injuring PLL in its business.

129.  Because the injury to PLL's business flows directly from the harm to competition likely to result from this acquisition, the injury to PLL constitutes antitrust injury.

50

**SECOND AMENDED COMPLAINT**

130. The injury likely to be inflicted on PLL as a result of the merger would cause irreparable harm to its business, entitling PLL to injunctive relief. PLL requested post-merger behavioral changes by Defendants to mitigate the competitive harms alleged herein to no avail, thereby necessitating the instant action and the relief sought. PLL has no adequate remedy at law.

## SECOND CLAIM FOR RELIEF

### Clayton Act, Section 7, 15 U.S.C. §18
### (Against Shift4 and Merchant Link)

131. PLL hereby incorporates by reference paragraphs 1-130 above, as though alleged fully herein.

132. The transaction between Shift4 and Merchant Link is likely to substantially lessen competition in the relevant product markets in violation of Section 7 of the Clayton Act, 15 U.S.C. §18.

133. For reasons described above, the relevant product markets include at least Payment Interfaces for Defendant-owned POS Systems for MLTSR, requiring integration, connection, and access to the Restaurant Manager, Future POS, POSitouch, and Harbortouch POS Systems, and Payment Interfaces for POS Systems specializing in MLTSR. The relevant geographic market is the United States.

134. Foreclosure is likely to occur in the market of Payment Interfaces for Defendant-owned POS Systems for MLTSR and Payment Interfaces for POS Systems specializing in MLTSR in the manner described above. If merged, Defendants will acquire sufficient market power to force competitors such as PLL to exit the Payment Interface market for MLTSR, thereby reducing customer choice and ultimately enabling Defendants to charge merchants supracompetitive prices.

135. Barriers to entry are high, and new entry is neither likely, timely, or sufficient to replace the competition lost as a result of the acquisition.

136. The transaction is likely to harm competition as well as consumers.

137. The transaction is likely to force PLL to exit the relevant product

51

**SECOND AMENDED COMPLAINT**

markets, thereby directly injuring PLL in its business.

138. Because the injury to PLL's business flows directly from the harm to competition likely to result from this acquisition, the injury to PLL constitutes antitrust injury.

139. The injury likely to be inflicted on PLL as a result of the merger would cause irreparable harm to its business, entitling PLL to injunctive relief.  PLL has no adequate remedy at law.

## THIRD CLAIM FOR RELIEF
### Attempted Monopolization in Violation of the Sherman Act, Section 2
### 15 U.S.C. §2
### (Against All Defendants)

140.  PLL hereby incorporates by reference paragraphs 1-139 above, as though alleged fully herein.

141. As discussed above, the relevant product markets include at least Payment Interfaces for Defendant-owned POS Systems for MLTSR, requiring integration, connection, and access to the Restaurant Manager, Future POS, POSitouch and Harbortouch POS Systems, and Payment Interfaces for POS Systems specializing in MLTSR.  The geographic market for these Payment Interfaces is the United States.

142. By engaging in the acts described above, Defendants have attempted to monopolize the markets for Payment Interfaces for Defendant-owned POS Systems for MLTSR and Payment Interfaces for POS Systems specializing in MLTSR. Defendants specifically attempted to monopolize the relevant markets and did so through willful acquisition of that monopoly power in the relevant markets, as distinguished from growth or development as a result of a superior product, business acumen, or historical incident.  Defendants have a dangerous probability of succeeding in monopolizing the relevant markets, as post-merger they stand to hold a market share of at least 40% for Payment Interfaces for POS Systems specializing in MLTSR, and between 30% - 40% of the POS Systems serving that market

**SECOND AMENDED COMPLAINT**

segment, if the merger is allowed to proceed without concessions and Shift4 Payments allowed to carry out the conduct described above, including eliminating independent Payment Interfaces from the relevant markets. In addition, for reasons discussed above, the relevant markets are characterized by significant entry barriers, with new firms unlikely to be able to enter in a timely, sufficient manner to effectively compete with, and serves as a constraint on prices for Shift4 Payments.

143. Such conduct constitutes attempted monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. §2.

144. Such conduct has caused, and will cause, harm to consumers and competition, reducing output and raising prices.

145. Such conduct is substantially likely to directly and proximately cause PLL irreparable harm, and thus PLL will suffer antitrust injury of the type that the antitrust laws were designed to prevent.

**FOURTH CLAIM FOR RELIEF**
**Monopolization in Violation of the Sherman Act, Section 2**
**15 U.S.C. §2**
**(Against All Defendants)**

146. PLL hereby incorporates by reference paragraphs 1-145 above, as though alleged fully herein.

147. As discussed above, the relevant product markets include at least Payment Interfaces for Defendant-owned POS Systems for MLTSR, requiring integration, connection, and access to the Restaurant Manager, Future POS and POSitouch POS Systems, and Payment Interfaces for POS Systems specializing in MLTSR. The relevant geographic market for these Payment Interfaces is the United States

148. By engaging in the acts described above, Defendants have monopolized the markets for Payment Interfaces for Defendant-owned POS Systems for MLTSR and Payment Interfaces for POS Systems specializing in MLTSR. The acquisitions were willful acquisitions of that monopoly power in the relevant markets, as

53
**SECOND AMENDED COMPLAINT**

distinguished from growth or development as a result of a superior product, business acumen, or historical incident.  For reasons discussed above, the relevant markets are characterized by significant entry barriers, with new firms unlikely to be able to enter in a timely, sufficient manner to effectively compete with and serve as a constraint on prices for Shift4 Payments.

149.  Such conduct constitutes monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. §2.

150.  Such conduct has caused and will cause harm to consumers and competition, reducing output, and raising prices.

151.  Such conduct is substantially likely to directly and proximately cause PLL irreparable harm, and thus, PLL will suffer antitrust injury of the type that the antitrust laws were designed to prevent.

## FIFTH CLAIM FOR RELIEF
### Tying in Violation of the Sherman Act, Section 1
### 15 U.S.C. §1
### (Against All Defendants)

152.  PLL hereby incorporates and references paragraphs 1 – 151 above, as though alleged fully herein.

153.  Defendants' POS, Payment Interface and MAS are separate products.

154.  Defendants have market power in the MLTSR POS System market by virtue of its four ████████ brands, Harbortouch, Restaurant Manager, FuturePOS and POSitouch, which have enabled them to be a ████████████████████████ ████████████████████████ [70]

155.  Defendants are now tying the two products together, requiring that merchants use their Interface with their POS.  Merchants have no choice but to use Defendants' Interface when installing new POS units.

156.  The above-described unlawful tying forecloses a substantial volume of

---

[69] ████████████████, Shift4_00002 at 6.
[70] ████████████████, Shift4_00032 at 52.

**SECOND AMENDED COMPLAINT**

commerce. Competing Interfaces will be deprived of several million dollars of revenue if no longer maintained as alternatives to Defendants' Interface.

157. Such conduct is substantially likely to directly and proximately cause PLL irreparable harm, and thus, PLL will suffer antitrust injury of the type that the antitrust laws were designed to prevent.

158. The tying arrangement described herein constitutes a *per se* violation of Section 1 of the Sherman Act.

## PRAYER FOR RELIEF

WHEREFORE, PLL seeks the following relief:

A.     A declaration that Lighthouse's acquisitions of Action Systems. Inc./Restaurant Manager, Future POS Inc/FuturePOS, Restaurant Data Concepts, Inc./POSitouch, Shift4 Corp., and Merchant Link violate Section 7 of the Clayton Act, 15 U.S.C. §18;

B.     A declaration that Defendants' conduct constitutes attempted monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. §2;

C.     A declaration that Defendants' conduct constitutes monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

D.     A declaration that Defendants' conduct constitutes tying in violation of Section 1 of the Sherman Act, 15 U.S.C. §1;

E.     An order preliminarily enjoining Defendants from carrying out the acquisition of Shift4 Corp. by Lighthouse, the acquisition of Merchant Link by Shift4, or any other transaction or agreement that would allow these companies to combine, and requiring Defendants to hold all assets separate during the pendency of this litigation;

F.     An order permanently enjoining Defendants from carrying out the acquisition of Shift4 Corp. by Lighthouse, the acquisition of Merchant Link by Shift4, or any other transaction or agreement that would allow these two companies to combine;

55

**SECOND AMENDED COMPLAINT**

G.    An order requiring Shift4 to divest such assets as necessary to restore the competitive conditions that existed prior Defendants' acquisitions of Shift4 Corp. and Merchant Link;

H.    The award to Plaintiff of three-fold the damages caused by Defendants' antitrust violations as alleged herein;

I.    An order awarding reasonable attorneys' fees and costs of this suit; and

J.    Such other further and permanent equitable relief as may be reasonably likely to cure the harm to competition caused by this merger, or that this Court deems just and proper.

Dated: November 4, 2019

/s/ *Daniel J. Mogin*
Daniel J. Mogin (Bar No. 95624)
Jennifer M. Oliver (Bar No. 311196)
**MOGINRUBIN LLP**
600 W. Broadway, Suite 3300
San Diego, CA 92101
T: 619-687-6611
F: 619-687-6610
dmogin@moginrubin.com
joliver@moginrubin.com

Jonathan L. Rubin
(*Pro hac vice*)
(D.C. Bar No. 353391)
**MOGINRUBIN LLP**
1615 M Street, NW, Third Floor
Washington, D.C. 20036
T: 202-630-0616
F: 877-247-8586
jrubin@moginrubin.com

*Counsel for Plaintiffs*

**SECOND AMENDED COMPLAINT**

**JURY DEMAND**

Plaintiff Payment Logistics Limited demands a trial by jury for all claims of relief so triable.


Dated: November 4, 2019

/s/ *Daniel J. Mogin*
Daniel J. Mogin (Bar No. 95624)
Jennifer M. Oliver (Bar No. 311196)
**MOGINRUBIN LLP**
600 W. Broadway, Suite 3300
San Diego, CA 92101
T: 619-687-6611
F: 619-687-6610
dmogin@moginrubin.com
joliver@moginrubin.com


Jonathan L. Rubin
(*Pro hac vice to be applied for*)
(D.C. Bar No. 353391)
**MOGINRUBIN LLP**
1615 M Street, NW, Third Floor
Washington, D.C. 20036
T: 202-630-0616
F: 877-247-8586
jrubin@moginrubin.com

*Counsel for Plaintiffs*

**SECOND AMENDED COMPLAINT**