UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PAYMENT LOGISTICS LIMITED,<br><br>                    Plaintiff,<br><br>v.<br><br>LIGHTHOUSE NETWORK, LLC et al.,<br><br>                  Defendants. | Case No.:  3:18-cv-00786-L-AGS<br><br>**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS [doc. no. 104] AND DENYING PLAINTIFF'S MOTION TO FILE A SUR-REPLY [doc. no. 114]** |

Pending before the Court is Defendants' motion to dismiss Plaintiff's second amended complaint. Plaintiff opposed the motion and Defendants replied. To the extent Defendants raised new arguments in their reply, the arguments were not considered in this order. *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief."). Accordingly, Plaintiff's motion to file a sur-reply (doc. no. 114) is denied as moot. The Court decides the motions on the briefs without oral argument. *See* Civ. L. R. 7.1 (d.1). For the reasons stated below, Defendants' motion to dismiss is granted.

**I.    BACKGROUND**

Plaintiff Payment Logistics Limited ("PLL") alleges antitrust violations in the payment processing industry for mid-to-large table-service restaurants.  Between 2017 and 2019, through horizontal and vertical acquisitions, Defendant Lighthouse Network,

1

LLC ("Lighthouse") acquired some of Plaintiff's competitors and vertically integrated its services.  Plaintiff claims Defendants' mergers and acquisitions substantially lessen competition.

Restaurants[1] utilize the following products and services to process customers' card payments: (1) point-of-sale ("POS") systems, which are comprised of hardware, software, and external support services that enable merchants to manage restaurant operations and process payments; (2) merchant account services, which enable merchants to connect to a network of credit and debit card companies for authorization and settlement of electronic payment transactions; and (3) direct processors and/or payment interfaces, which transmit payment data from POS systems to merchant account service networks. (Second Am. Compl., doc. no. 117 ("SAC"),[2] at 6-7).[3]

Restaurant owners purchase POS systems, which serve as the "brain" of the restaurant operations, managing everything from seating and reservations, patrons' orders, assisting the kitchen to prepare orders so that the patrons at the same table uniformly receive their courses at the appropriate time, inventory tracking, recording employee time, financial and productivity oversight, as well as payment processing. (SAC ¶¶ 37, 38.)  The POS system represents a significant investment in time, money and business disruption for the restaurant, and is therefore rarely switched more than every five to seven years.  (*Id.* ¶¶ 38, 73.)  POS dealers assist restaurants in selecting the POS system to fit their needs.  (*Id.* at 7.)  If the need arises, rather than changing the

---

[1]     The relevant segment of the restaurant industry is mid-to-large table-service restaurants.  All references to restaurants relate to this segment.

[2]     The first and second amended complaints, as well as the parties' motion to dismiss briefing were filed under seal pursuant to leave of Court.  Redacted public versions were separately filed at docs. no. 59, 98, 115 (Plaintiff's opposition).

[3]     Page numbers referenced herein are assigned by the electronic case filing system.

entire POS system, a restaurant is more likely to upgrade its software, including the payment interface and/or merchant account service. (*Id.* ¶ 38.)

Once a restaurant installs a POS system, it may be limited to the payment interface(s) and/or merchant account service provider(s) already integrated in the system or that can quickly become integrated. (SAC ¶ 74.) Software developers who create POS systems dictate which payment interfaces are capable of integration with their POS system software. (*Id.*) A POS system may offer multiple payment interfaces, allowing a restaurant owner a choice of payment interfaces, and consequently also a choice of merchant account service providers. (*Id.* ¶ 77.)

Since approximately 2014, the industry has been undergoing "significant consolidation," resulting in alliances or acquisitions vertically integrating POS systems, payment interfaces, and merchant account service providers. (SAC ¶ 79; *see also* First Am. Compl., doc. no. 88, ¶ 60.) Such networks are considered "closed." (SAC ¶ 79.) This means that the POS system may be compatible only with a specific payment interface or interfaces, and the payment interface may be aligned with a specific merchant account service provider. (*Id.* at 5; *see also id.* ¶¶ 3, 64, 78.) In contrast, payment interfaces that are compatible with multiple POS systems or merchant account networks are considered "neutral" or "independent." (*Id.* at 5; *see also id.* ¶¶ 3, 64.) Prior to consolidation, many POS systems offered multiple payment interfaces, each providing restaurant owners with a choice of payment interfaces and merchant account service providers. (*Id.* ¶ 77.) With consolidation, many POS systems became "closed." (*See id.* ¶ 80.)

Whether a payment interface is closed or neutral makes a difference. (SAC ¶ 64.) Neutral or independent payment interfaces charge restaurants the same data transmission fee regardless of the merchant account service provider, while closed interfaces charge more for merchant account services outside the closed network. (*Id.* at 5.)

Plaintiff provides independent payment interfaces and merchant account services in the relevant restaurant segment. Prior to the mergers and acquisitions that form the

basis for this action, Lighthouse owned Harbortouch, a POS system, and provided merchant account services. (SAC ¶¶ 5-6.)  In the summer and fall of 2017, Lighthouse acquired three POS systems (Restaurant Manager, Future POS, and POSitouch).  (*Id.* ¶¶ 5, 80, 81.)  After the acquisition, it "restricte[ed] POS Dealers' promotion of non-Lighthouse-affiliated Payment Interfaces, such as PLL."  (*Id.* ¶ 80.)

In January 2018, Lighthouse acquired Defendant Shift4 Corporation ("Shift4 Corp."), a payment interface company.  (*Id.* ¶ 6.)  Lighthouse created Defendant Shift 4 Payments, LLC ("Shift4"), a new company which consolidated the three levels of the payment processing industry: POS systems, payment interfaces, and merchant account services.  (*Id.*)

Prior to the acquisition, Shift4 Corp. was an independent payment interface compatible with multiple merchant account service providers.  (SAC ¶¶ 6, 22, 64.)  As part of the merger, Lighthouse planned to eliminate Shift4 neutrality to increase transaction fees.  (*Id.* ¶ 6.)  In February 1, 2018, Defendants started to steer the restaurants using Defendant-owned POS systems to Shift4 for payment processing.  (SAC ¶¶ 90-91.)  They sought to accomplish this by charging restaurants higher fees for processing payments outside the Shift4 network.  (*Id.* ¶¶ 10, 90-91.)

In 2018, Shift4 negotiated strategic partnerships with two independent software vendors who provided software for POS systems Maitre'D and Micros.  (SAC ¶ 6.)

In September 2019, Defendants acquired Defendant Merchant Link, LLC ("Merchant Link"), one of the largest payment interfaces in the relevant restaurant segment.  (SAC ¶ 11.)  With this acquisition, Defendants increased their share of the payment interface market for POS systems in the relevant restaurant segment to 47%.  (*Id.* ¶¶ 11, 86.)  Before the acquisition, Merchant Link was an independent payment interface.  (*Id.* at 4; *see also id.* ¶ 84.)  Post-acquisition, Defendants started "attempting to coerce" Merchant Link users to migrate to the Shift4 interface.  (*Id.* ¶ 11.)

The majority of Merchant Link clients in the relevant market use Micros, one of the largest POS systems.  (SAC ¶¶ 11, 24.)  Merchant Link has a "special relationship"

with Micros, which Plaintiff contends Defendants will be "able to exploit" "to limit independent Payment Interfaces' access" to the restaurant clients using Micros POS systems.  (*Id*. ¶¶ 11, 85.)

As a stated investment goal, Lighthouse planned to increase its revenues by switching its POS systems to Shift4 and charging restaurants a fee if they switched away from Shift4 payment processing or Lighthouse merchant account services.  In the long run they planned to exploit restaurants' reluctance to switch POS systems by increasing payment processing fees even for those restaurants which stayed with Shift4.  (*Id.* ¶¶ 7, 10, 12-13.)

According to Plaintiff, there are only three neutral POS systems left in the relevant restaurant segment (Maitre'D, Micros, and Focus POS) on which independent payment interfaces can compete.  (*Id.* ¶ 104.)  These POS systems represent 17% of the relevant market.

Plaintiff asserts five causes of action.  First, it contends that Lighthouse's acquisition of Shift4 Corp. to create Shift4 Payments violates § 7 of the Clayton Act, 15 U.S.C. § 18, because it is likely to substantially lessen competition.  (SAC ¶ 123.)  Second, Plaintiff contends that the acquisition of Merchant Link by Shift 4 Payments violates § 7 of the Clayton Act, 15 U.S.C. § 18, because it is likely to substantially lessen competition.  (*Id.* ¶ 132.)  Third and fourth, Plaintiff contends that Defendants have attempted to monopolize, or, alternatively, that they monopolize, the relevant markets in violation of § 2 of the Sherman Act, 15 U.S.C. § 2.  (*Id.* ¶¶ 142, 148.)  For the foregoing causes of action, Plaintiff alleges two relevant markets, payment interfaces for POS systems in the relevant restaurant segment, and, more narrowly, payment interfaces for the POS systems Defendants own: Restaurant Manager, Future POS, POSitouch, and Harbortouch.  (*Id.* ¶¶ 124, 133, 141, 147.)  Finally, Plaintiff contends that Defendants require restaurants that use Defendant-owned POS systems to use the Shift4 payment interface and that this constitutes unlawful tying in violation of Section 1 of the Sherman

/ / / / /

1  Act, 15 U.S.C. § 1.  (*Id.* ¶¶ 153-55.)  The Court has subject matter jurisdiction pursuant to
2  28 U.S.C. § 1331.

3       Plaintiff claims that Defendants' conduct is likely to force it and other independent
4  payment interfaces out of the relevant markets, or, alternatively, deprive them of millions
5  of dollars in revenue.  (SAC ¶¶ 125-28, 133-37, 142, 144, 150, 156.)  Specifically,
6  Plaintiff alleges it has lost to Shift4 approximately 150 accounts worth $800,000 in
7  annual revenue and expects to lose more.  (*Id.* ¶¶ 15, 94.)  It also claims that at least two
8  other independent payment interfaces in the relevant restaurant segment have been
9  similarly harmed, forcing one to exit the market.  (*Id.* ¶ 95.)  Finally, Plaintiff claims that
10 Defendants' conduct is likely to harm consumers by reducing their choice of payment
11 interfaces and, ultimately, enabling Defendants to charge restaurants supracompetitive
12 prices.  (*Id.* ¶¶ 125, 134, 144, 150.)

13      Plaintiff requests declaratory relief, an order requiring Shift4 to divest assets to
14 restore competitive conditions pre-acquisitions, as well as treble damages.  (SAC at 70-
15 71.)  Plaintiff's request for a preliminary injunction was denied.  (*See* doc. no. 85.)

16      Defendants move to dismiss Plaintiff's second amended complaint pursuant to
17 Federal Rule of Civil Procedure 12(b)(6).  They argue that the complaint does not
18 adequately allege antitrust injury, a relevant market, market power in either of the
19 relevant markets, or an illegal tie.

20 **II.    LEGAL STANDARD**

21      A motion under Rule 12(b)(6) tests the sufficiency of the complaint.  *Navarro v.*
22 *Block*, 250 F.3d 729, 732 (9th Cir. 2001).[4] Dismissal is warranted where the complaint
23 lacks a cognizable legal theory.  *Shroyer v. New Cingular Wireless Serv., Inc.*, 622 F.3d
24 1035, 1041 (9th Cir. 2010).  Alternatively, a complaint may be dismissed where it
25 / / / / /

26 _____

27
28 [4]      Unless otherwise noted, internal quotation marks, ellipses, brackets, citations, and
   footnotes are omitted from quotations.

presents a cognizable legal theory yet fails to plead essential facts under that theory. *Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 534 (9th Cir. 1984).

A pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  In reviewing a Rule 12(b)(6) motion, the Court must assume the truth of all factual allegations and construe them most favorably to the nonmoving party. *Huynh v. Chase Manhattan Bank*, 465 F.3d 992, 997, 999 n.3 (9th Cir. 2006). However, legal conclusions need not be taken as true merely because they are couched as factual allegations. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Similarly, "conclusory allegations of law and unwarranted inferences are not sufficient to defeat a motion to dismiss." *Pareto v. Fed. Deposit Ins. Corp.*, 139 F.3d 696, 699 (9th Cir. 1998). When ruling on a motion to dismiss, the Court may consider the facts alleged in the complaint, documents attached to the complaint, and documents relied upon but not attached to the complaint when authenticity is not contested. *Lee v. City of Los Angeles*, 250 F.3d 668, 688-89 (9th Cir. 2001).

## III. DISCUSSION

"In addition to the traditional limitations upon standing imposed by the Constitution, Congress imposed additional limitations upon those who can recover damages under the antitrust laws" by enacting Section 4 of the Clayton Act, 15 U.S.C. § 15(a).  *Pool Water Prods. v. Olin Corp.*, 258 F.3d 1024, 1034 (9th Cir. 2001).  "These limitations are sometimes referred to as the antitrust standing requirements." *Id.*

Section 4 provides in relevant part that

> any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States . . ., and shall recover threefold the damages by him sustained . . ..

Although the provision is broadly worded to suggest that all persons whose injuries are causally related to an antitrust violation could recover damages, its interpretation is narrower.  *Amarel v. Connel*, 102 F.3d 1494, 1507 (9th Cir.).

7

"The most important limitation is that the private party must prove the existence of antitrust injury." *Pool Water Prods.*, 258 F.3d at 1034; *see also Amarel*, 102 F.3d at 1507. "Under Section 4, private plaintiffs can be compensated only for injuries that the antitrust laws were intended to prevent." *Pool Water Prods.*, 258 F.3d at 1034. This means that "injury, although causally related to an antitrust violation, nevertheless will not qualify as 'antitrust injury' unless it is attributable to an anti-competitive aspect of the practice under scrutiny." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990). "If the injury flows from aspects of the defendant's conduct that are beneficial or neutral to competition, there is no antitrust injury, even if the defendant's conduct is illegal *per se*." *Pool Water Prods.*, 258 F.3d at 1034. "[T]he antitrust laws are only intended to preserve competition for the benefit of consumers. Consumer welfare is maximized when economic resources are allocated to their best use and when consumers are assured competitive price and quality." *Id*.

Relying on *Amarel v. Connel*, Plaintiff argues it has suffered an antitrust injury because one form of such injury is "coercive activity that prevents its victims from making free choices between market alternatives." (Pl.'s Opp'n to Defs' Mot. to Dismiss Pl.'s SAC, doc. no. 119 ("Opp'n"), at 24 (citing *Amarel*, 102 F.3d at 1509)). *Amarel* does not assist Plaintiff, as its facts and the claimed injury present a distinguishable scenario.

As here, in *Amarel*, the defendants were vertically integrated. *See Amarel*, 102 F.3d at 1502. They were cooperatives that integrated all phases of rice production: paddy farming, milling, and sale. *Id.* at 1502, 1500, 1508. Plaintiffs were independent rice paddy farmers who sold their rice to independent rice mills. *Id.* at 1500. Plaintiffs were defendants' competitors "since the cooperatives compete at multiple levels of rice production." *Id.* at 1508; *see also id.* at 1509. They alleged a conspiracy among the cooperatives and other defendants to eliminate independent rice purchasers, farmers and mills by driving the independent mills and farmers from the market or forcing them to join one of defendants' cooperatives. *Id.* at 1503, 1508. Among other things, plaintiffs

alleged that defendants succeeded in reducing the number of independent mills to two and used their monopoly power (75% of the market) to drive down the prices of paddy and milled rice and boycotted one of the independent mills. *Id.* at 1503. To accomplish this, defendants allegedly used predatory pricing to depress the market in which plaintiffs sold their rice. *Id.* at 1508. In addition, defendants boycotted one of the two remaining independent mills by refusing to sell rice to it for milling. *Id.* Plaintiffs alleged they were directly harmed by the depressed prices and the threat of losing one of the two mills through which they sold their rice. *Id.*

As here, among other things, defendants challenged plaintiffs' standing arguing that the alleged injury was not the type the antitrust laws were intended to prevent. *Amarel*, 102 F.3d at 1507. The court held that losses caused by predatory pricing confer antitrust standing because predatory pricing has the requisite anticompetitive effect. *Id.* at 1508. Predatory pricing is pricing below defendant's cost when the defendant could probably recoup the resulting losses. *See Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 900 (9th Cir. 2008).

> In the context of pricing practices, only predatory pricing has the requisite anticompetitive effect. Low prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition. Hence, they cannot give rise to antitrust injury.

*Atl. Richfield*, 495 U.S. at 339-40. While the plaintiffs in *Amarel* claimed predatory pricing, Plaintiff here does not. "Absent . . . predation, it is immaterial whether the price reduction is the result of illegal price setting, illegal mergers and acquisitions, collusion, price discrimination or any other antitrust violation." *Pool Water Prods.*, 258 F.3d at 1035.

Alternatively, the court held that "[a]nother form of antitrust injury is coercive activity that prevents its victims from making free choices between market alternatives." *Amarel*, 102 F.3d at 1509. The court found standing on this basis because the plaintiffs alleged that defendants boycotted one of the two remaining independent mills and refused

to deal with it.  *Id.*  "The Supreme Court has identified the anticompetitive effects that may flow from group boycotts and concerted refusals to deal."  *Id.*  Unlike in *Amarel*, Plaintiff here does not claim concerted action, boycotts or refusal to deal.

Moreover, Plaintiff does not claim that choices had been reduced as in *Amarel* (two independent mills) or in *CollegeNET, Inc. v. Common Application, Inc.*, 711 Fed. Appx. 405 (9th Cir. 2017) (leaving one dominant provider).  (*See* Opp'n at 24-25 (citing *Amarel* and *CollegeNET*).)  According to the complaint, at least three POS systems are available on which independent payment interfaces can compete: Maitre'D, Focus POS and Micros.  (SAC ¶ 104.)  Micros is one of the largest POS systems in the relevant restaurant segment.  (*Id.* ¶ 11.)  Although Plaintiff alleges that by acquiring Merchant Link, Defendants now own the customer information for Merchant Link's Micros customers, Plaintiff does not contend that this precludes it from competing with Shift4 for the same Micros customers.  (*See id.* ¶ 85.)

Further, Plaintiff does not contend that the POS systems Defendants acquired, Restaurant Manager, Future POS and POSitouch, are off-limits after the acquisition.  For example, Plaintiff's interface is already integrated on the Restaurant Manager POS system.  (SAC ¶ 69.)  Although Plaintiff contends Defendants have "eliminat[ed] competition on their POS systems" (Opp'n at 26), the complaint does not support this assertion.  Plaintiff does not allege that Defendants have precluded restaurants with Defendant-owned POS systems from payment processing via Plaintiff's payment interface.  Instead, it alleged that, by charging higher fees for other payment interfaces, Defendants encourage these customers to choose or switch to Shift4.  (*See id.* ¶¶ 90-92.)  This does not eliminate competition but makes is harder for independent payment interfaces to compete.  For example, to compete, Plaintiff could reduce its profit margins to absorb the higher fees Defendants charge to its customers.  (*See* Opp'n at 25.)  Plaintiff has cited no binding authority for the proposition that, in the absence of predatory pricing, squeezing a competitor's profit margin is sufficient to constitute an antitrust injury.

To the extent Plaintiff's theory of antitrust injury is based on the contention that Defendants intended to switch Plaintiff's customers to Shift4 and then raise the processing fees for *all* customers, not only those processing their payments outside the Shift4 network (*see* Opp'n at 26-27), it is unavailing. *See Atl. Richfield*, 495 U.S. at 337 n.7; *see also Pool Water Prods.*, 258 F.3d at 1035 (§ 7 claim).

Because Plaintiff has not alleged an antitrust injury, the Court need not consider Defendants' other arguments for dismissal. Their motion to dismiss is granted.

"In dismissing for failure to state a claim, a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Ebner v. Fresh, Inc.*, 838 F.3d 958, 963 (9th Cir. 2016). Rule 15 advises leave to amend shall be freely given when justice so requires. Fed. R. Civ. P. 15(a)(2). "This policy is to be applied with extreme liberality." *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003).

> In the absence of any apparent or declared reason – such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment, etc. – the leave sought should, as the rules require, be freely given.

*Foman v. Davis*, 371 U.S. 178, 182 (1962).

Plaintiff's first amended complaint was dismissed for failure to allege an antitrust injury. (*See* doc. no. 96.) The Court declines to grant leave to amend the same defect. *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1007 (9th Cir. 2009). Furthermore, based on the allegations presented in the first and second amended complaints, it appears that leave to amend would be futile.

/ / / / /

**IV.**  **CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss is granted.

**IT IS SO ORDERED.**

Dated:  November 30, 2020

_____
Hon. M. James Lorenz
United States District Judge

3:18-cv-00786-L-AGS